LUDMIL A. CHOTKOWSKI *v.* STATE OF
CONNECTICUT
(15399)

Berdon, Katz, Palmer, McDonald and Peters, Js.

Argued November 1, 1996—officially released March 18, 1997

*Harold J. Geragosian,* for the appellant (plaintiff).

*Gregory T. D'Auria*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Carolyn K. Querijero*, assistant attorney general, for the appellee (defendant).

*Opinion*

PALMER, J. This appeal marks the parties' third visit to this court in connection with litigation spanning three decades and arising out of a claim by the plaintiff, Ludmil A. Chotkowski, that the defendant, the state of Connecticut, improperly reduced his salary while he was employed at the state Veterans' Home and Hospital over twenty years ago. The principal issues raised by this appeal are: (1) whether a special act of the legislature; Spec. Acts 1991, No. 91-8;[1] authorizing the plaintiff to

---

[1] Special Acts 1991, No. 91-8, entitled "An Act Concerning the Claim Against the State of Ludmil Chotkowski," provides: "Be it enacted by the Senate and House of Representatives in General Assembly convened:

"(a) Notwithstanding the failure to file a proper notice of a claim against the state of Connecticut with the clerk of the office of the claims commissioner, as required by section 4-147 of the general statutes, within the time specified by section 4-148 of the general statutes, and notwithstanding the provisions of subsection (b) of section 4-148 of the general statutes barring the presentment of a claim once considered by the claims commissioner, by the general assembly or in a judicial proceeding, Ludmil Chotkowski is authorized to present his claim against the state to the claims commissioner, provided he files a notice of such claim with the clerk of the office of the claims commissioner in accordance with section 4-147 not later than October 1, 1991.

"(b) The general assembly finds that: In 1975 Ludmil Chotkowski was employed by the state as a physician at the Rocky Hill Veterans' Home and Hospital; that in 1975 he received notice that his job title would be changed and his salary would be reduced; that Ludmil Chotkowski in a letter dated May 20, 1975 wrote to the department of personnel and administration to request the 'opportunity of appealing this decision before it should become final'; that the commissioner of personnel and administration advised Ludmil Chotkowski in a letter dated June 3, 1975 that 'there is no existing statute or regulation which would permit such an appeal, either to me or any other appropriate body'; that subsequently in 1975 Ludmil Chotkowski's job title was changed and his salary was reduced; and that the preceding findings were not contradicted by any testimony on the record at legislative public hearings held on March 14, 1983, March 29, 1985, and March 11, 1991. The general assembly therefore finds that Ludmil Chotkowski failed to timely

present a claim to the claims commissioner requesting permission to bring an action against the state after the expiration of the limitation period applicable to his claim, constitutes an "exclusive public emolument" prohibited by article first, § 1, of the Connecticut constitution;[2] and (2) if not, whether the trial court properly rejected the plaintiff's claims for breach of express contract, breach of implied contract and promissory estoppel. The plaintiff commenced this action after the claims commissioner, acting pursuant to the authority conferred upon him by No. 91-8 of the 1991 Special Acts (S.A. 91-8), granted the plaintiff permission to sue the state. At trial, the state claimed that S.A. 91-8 violates article first, § 1, of the state constitution and, consequently, that the claims commissioner lacked jurisdiction to entertain the plaintiff's request for permission to sue the state. The state further maintained that even if S.A. 91-8 satisfies constitutional requirements, the plaintiff had failed to establish that he was entitled to relief under any of his claims. The trial court rejected the state's constitutional argument, but rendered judgment for the state on the ground that the plaintiff had failed to prove his claims. The plaintiff appealed from

file a notice of a claim against the state with the claims commissioner because he was misinformed by a state official and was misled by such official into believing that he had no right of redress against the state for the damages he allegedly suffered. The general assembly further finds that it would be just and equitable to authorize Ludmil Chotkowski to present his claim against the state to the claims commissioner, that there are compelling equitable circumstances to support such authorization and that such authorization would serve a public purpose.

"(c) The state shall be barred from setting up the failure to comply with the provisions of sections 4-147 and 4-148 of the general statutes, from denying that notice of the claim was properly and timely given pursuant to sections 4-147 and 4-148 of the general statutes and from setting up the fact that the claim had once been considered by the claims commissioner, by the general assembly or in a judicial proceeding as defenses to such claim."

[2] Article first, § 1, of the Connecticut constitution provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. In November, 1969, the plaintiff, a physician, left his private medical practice to accept an appointment as a "special assistant" at the state Veterans' Home and Hospital in Rocky Hill. In February, 1975, the position of special assistant was eliminated, and the plaintiff was reclassified as a "professional specialist" with no reduction in pay. The plaintiff then received notice of his proposed reclassification to "chief of medicine." Through correspondence with various state administrators, the plaintiff protested his reclassification and corresponding salary reduction. On May 20, 1975, he forwarded a letter to the state department of personnel and administration requesting the "opportunity of appealing this decision before it should become final." The commissioner of personnel and administration, Frederic Rossomando, responded by letter dated June 3, 1975 (Rossomando letter), in which, contrary to applicable law, he stated: "I am advised that there is no existing statute or regulation which would permit such an appeal, either to me or any other appropriate body." Thereafter, on June 6, 1975, the plaintiff was reclassified to the position of "chief of medicine," and his salary was reduced by $303.64 biweekly.

On April 8, 1976, nearly one year later, the plaintiff's employment was terminated as a result of his continued conflicts with administration officials over his salary reduction.[3] The plaintiff appealed the termination to the state personnel appeal board (board), which dismissed

[3] Shortly thereafter, on May 7, 1976, the plaintiff was rehired by the state as an "internist" at the Connecticut Valley Hospital, a position he held until his retirement in June, 1986.

the appeal, concluding that the plaintiff was not entitled to review of his claims because he was not a "permanent employee holding a position in the classified service" within the meaning of General Statutes (Rev. to 1975) § 5-202 (a).[1] The plaintiff's administrative appeal of the board's decision was sustained by the trial court, *Pickett, J.*, on the ground that the plaintiff was a permanent employee in the classified state service for purposes of § 5-202 (a). The board appealed to this court, and we affirmed the judgment of the trial court. *Chotkowski* v. *Connecticut Personnel Appeal Board*, 176 Conn. 1, 404 A.2d 868 (1978). The parties eventually agreed to a settlement of the plaintiff's employment termination claim.

After settling his employment termination claim, the plaintiff filed a notice of claim with the claims commissioner under General Statutes § 4-147[5] requesting permission to sue the state for lost wages based upon the allegedly improper reclassification and salary reduction. The claims commissioner rejected the plaintiff's claim, concluding that it was barred by the one year

[1] General Statutes (Rev. to 1975) § 5-202 (a) provided in relevant part that "[a]ny permanent employee holding a position in the classified service who is demoted, suspended or dismissed, or is individually aggrieved as a result of alleged discrimination, unfair treatment or unsafe or unhealthy working conditions or interpretation and application of state personnel regulations . . . may obtain a review of such action or alleged grievance by presenting a written appeal to the personnel appeal board. . . ." Section 5-202 (a) has since been amended and the personnel appeal board replaced by the employees' review board. See General Statutes § 5-201 et seq.

[5] General Statutes § 4-147 provides in relevant part: "Any person wishing to present a claim against the state shall file with the clerk of the Office of Claims Commissioner a notice of claim, in duplicate, containing the following information: (1) The name and address of the claimant; the name and address of his principal, if the claimant is acting in a representative capacity, and the name and address of his attorney, if the claimant is so represented; (2) a concise statement of the basis of the claim, including the date, time, place and circumstances of the act or event complained of; (3) a statement of the amount requested, and (4) a request for permission to sue the state, if such permission is sought. . . ."

limitation for presenting claims against the state prescribed by General Statutes (Rev. to 1979) § 4-148 (a).[6]

Thereafter, the legislature, at the plaintiff's urging, passed No. 85-24 of the 1985 Special Acts (S.A. 85-24),[7] which authorized the plaintiff to prosecute his claim against the state despite his failure to comply with the requirements of § 4-148 (a). The plaintiff then renewed his claim to the claims commissioner, who granted the plaintiff permission to sue the state in accordance with General Statutes (Rev. to 1985) § 4-160 (a).[8]

[6] General Statutes (Rev. to 1979) § 4-148 (a) provides: "No claim shall be presented under this chapter but within one year after it accrues. Claims for injury to person or damage to property shall be deemed to accrue on the date when the damage or injury is sustained or discovered or in the exercise of reasonable care should have been discovered, provided no claim shall be presented more than three years from the date of the act or event complained of."

[7] Special Acts 1985, No. 85-24, entitled "An Act Validating the Filing of Notice of the Claim of Ludmil Chotkowski with the Claims Commissioner," provides: "Be it enacted by the Senate and House of Representatives in General Assembly convened:

"The claim of Ludmil Chotkowski, filed against the state of Connecticut with the claims commissioner, otherwise valid except that proper notice of said claim was not filed with the clerk of the office of the claims commissioner as required by section 4-147 of the general statutes and within the time specified by section 4-148 of the general statutes, is validated and declared sufficient to permit Ludmil Chotkowski to maintain and prosecute his claim against the state notwithstanding the lack of proper notice. The state shall be barred from setting up the failure to comply with the provisions of sections 4-147 and 4-148 of the general statutes with respect to the claim and shall also be barred from denying that notice of the claim was properly and timely given pursuant to sections 4-147 and 4-148 of the general statutes."

[8] General Statutes (Rev. to 1985) § 4-160 provides in relevant part: "Authorization of actions against the state. (a) When the claims commissioner deems it just and equitable, he may authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable. In each such action the claimant shall allege such authorization and the date on which it was granted. The state waives its immunity from liability and from suit in each such action and waives all defenses which might arise from the eleemosynary or governmental nature of the activity complained of. The rights and liability of the state in each such action shall be coextensive with and shall equal the rights and liability of private persons in like circumstances. . . ."

The plaintiff subsequently commenced an action against the state alleging breach of contract and promissory estoppel. The trial court, *O'Neill, J.*, granted the state's motion for summary judgment on the ground that the plaintiff, as a permanent employee in the classified state service, enjoyed only statutory, and not contractual, employment rights. The plaintiff appealed to this court and we held that S.A. 85-24 constituted an "exclusive public emolument" prohibited by article first, § 1, of the state constitution. Accordingly, we remanded the case to the trial court with direction to dismiss the plaintiff's action for lack of jurisdiction.[9] *Chotkowski* v. *State*, 213 Conn. 13, 566 A.2d 419 (1989) (*Chotkowski II*).

The legislature then enacted No. 90-284 of the 1990 Public Acts (P.A. 90-284), now codified at § 4-148 (b),[10] which provides that the legislature, by special act, may excuse a claimant's failure to file a timely notice with the claims commissioner provided that the legislature "deems such authorization to be just and equitable and makes an express finding that such authorization is supported by compelling equitable circumstances and would serve a public purpose." Section 4-148 (b) also purports to ensure that the legislature's "finding shall not be subject to review by the superior court."[11]

---

[9] In light of our holding that the claims commissioner lacked jurisdiction over the plaintiff's claim due to the unconstitutionality of S.A. 85-24, we concluded that "the summary judgment adjudicating the merits of the plaintiff's action must be set aside." *Chotkowski II*, supra, 213 Conn. 19. We, therefore, did not consider the merits of the plaintiff's claims against the state.

[10] General Statutes § 4-148 (b) provides: "The general assembly may, by special act, authorize a person to present a claim to the claims commissioner after the time limitations set forth in subsection (a) of this section have expired if it deems such authorization to be just and equitable and makes an express finding that such authorization is supported by compelling equitable circumstances and would serve a public purpose. Such finding shall not be subject to review by the superior court."

[11] We note that the circumstances surrounding the plaintiff's case apparently provided the impetus for the enactment of P.A. 90-284. The plaintiff

Acting under the aegis of § 4-148 (b), the legislature, again at the request of the plaintiff, enacted S.A. 91-8, which, like S.A. 85-24, authorizes the plaintiff to present his claim to the claims commissioner notwithstanding his lack of compliance with § 4-148 (a). Unlike S.A. 85-24, however, S.A. 91-8 is predicated upon an express legislative finding that the plaintiff "failed to timely file a notice of a claim against the state with the claims commissioner because he was misinformed by a state official and was misled by such official into believing that he had no right of redress against the state for the damages he allegedly suffered," and, further, "that there are compelling equitable circumstances to support such authorization and that such authorization would serve a public purpose." See footnote 1. The plaintiff, upon passage of S.A. 91-8, renewed his claim with the claims commissioner, who again granted him permission to bring an action against the state.

The plaintiff then commenced this suit alleging breach of express contract, breach of implied contract and promissory estoppel.[12] The state moved to dismiss

himself testified before the judiciary committee in support of the bill; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1990 Sess., pp. 1234–36, remarks of Ludmil A. Chotkowski; and members of the legislature made express reference to the plaintiff's case in urging passage of the proposed legislation. See id., pp. 1103–1105, remarks of Senator A. Cynthia Matthews; 33 H.R. Proc., Pt. 17, 1990 Sess., p. 5817, remarks of Representative Richard D. Tulisano.

[12] In the first count of his complaint, the plaintiff alleges that two documents he received from the state personnel department in November, 1969, notifying him of his appointment and salary as a "special assistant" at the Veterans' Home and Hospital, constituted an express contract. In count two of the complaint, which sets forth a claim of promissory estoppel, the plaintiff alleges that several state officials represented that he would be appointed to the position of "special assistant" at a salary that "would be subject to future increases approximating increases for others in state employment." The plaintiff further alleges in count two that he left the private practice of medicine and accepted an appointment with the state in reliance on those representations. In the third count of the complaint, the plaintiff claims that "[t]he circumstances under which [he] was offered employment with the [state] and the specific acts and conduct of [the state's]

the action for lack of jurisdiction on the ground that S.A. 91-8 violates article first, § 1, of the state constitution. The trial court, *Stengel, J.*, denied the state's motion. The state thereafter filed a motion for summary judgment in which it renewed its constitutional challenge to S.A. 91-8 and, in addition, claimed that (1) the plaintiff's request for permission to sue the state was barred by § 4-148 (c), and (2) the plaintiff had failed to state a legally sufficient cause of action because his employment rights were statutory, rather than contractual, in nature. The trial court, *Fineberg, J.*, denied the state's motion on the ground that there were disputed factual issues material to the plaintiff's claims; see Practice Book § 378 et seq.; see also *Doty* v. *Mucci*, 238 Conn. 800, 805, 679 A.2d 945 (1996); and a trial to the court ensued. At the conclusion of the trial, the court, *Fineberg, J.*, rendered judgment for the state, concluding that the plaintiff had failed to establish that his employment with the state gave rise to any contractual rights and, further, that he had failed to prove the elements of his promissory estoppel claim.[13]

On appeal, the plaintiff claims that the trial court improperly determined that he had failed to establish

agents in promising to pay [him] at a specific rate and subject to projected increases constituted an agreement resulting from an implied contract between [him and the state]." The plaintiff asserts that the state breached a duty to him under each of the three counts by reducing his rate of pay commencing on June 6, 1975, and that he is entitled to damages from that date until his retirement from state service in 1986. See footnote 3.

[13] The state raised eight special defenses to the plaintiff's action: (1) failure to state a claim upon which relief can be granted; (2) laches; (3) statute of limitations; (4) res judicata; (5) sovereign immunity; (6) unconstitutionality of § 4-148 (b); (7) unconstitutionality of S.A. 91-8; and (8) release. The trial court rejected each of the state's special defenses except its first special defense, upon which the court did not expressly rule. Furthermore, although it rendered judgment against the plaintiff on each count of the complaint, the court found that the plaintiff would have been entitled to damages of $6680.08 had he been able to establish that the state had improperly reduced his pay.

that he was entitled to relief under each of his claims.[14] The state contends that the trial court improperly rejected its claim that S.A. 91-8 violates article first, § 1, of the state constitution and that the claims commissioner did not have jurisdiction to entertain the plaintiff's claim requesting permission to sue the state. The state further contends that even if S.A. 91-8 is constitutional, the trial court lacked jurisdiction over the plaintiff's action because the claim that he filed with the claims commissioner was barred by both General Statutes § 4-142[15] and General Statutes § 4-148 (c).[16] Finally, the state maintains that even if the claims commissioner had jurisdiction to consider the plaintiff's request for permission to bring this action, the trial court properly concluded that the plaintiff had failed to establish that he was entitled to relief under any of his claims.[17]

---

[14] The plaintiff also contends that the trial court improperly calculated the amount of damages to which he would be entitled if he had established that the state was liable for his lost wages. See footnote 13. We do not reach this issue, however, because we conclude that the trial court properly rejected each of the plaintiff's claims.

[15] General Statutes § 4-142 provides: "Claims commissioner. Excepted claims. There shall be a claims commissioner who shall hear and determine all claims against the state except: (1) Claims for the periodic payment of disability, pension, retirement or other employment benefits; (2) claims upon which suit otherwise is authorized by law; (3) claims for which an administrative hearing procedure otherwise is established by law; (4) requests by political subdivisions of the state for the payment of grants in lieu of taxes, and (5) claims for the refund of taxes."

[16] General Statutes § 4-148 (c) provides: "No claim cognizable by the claims commissioner shall be presented against the state except under the provisions of this chapter. Except as provided in section 4-156, no claim once considered by the claims commissioner, by the general assembly or in a judicial proceeding shall again be presented against the state in any manner."

[17] The plaintiff argues that the state is foreclosed from raising these claims because it failed to raise them in a cross appeal; see Practice Book § 4005; or enumerate them in a preliminary statement of the issues. See Practice Book § 4013 (a) (1). The plaintiff's claim is without merit. First, the state was not aggrieved by the trial court's judgment and, therefore, it could not properly file a cross appeal. Second, we may refuse to consider an issue not contained in a preliminary statement of issues only where the failure to do so prejudices the opposing party. Practice Book § 4013 (a) (1). In the

Because we agree with the trial court's conclusions, we affirm the judgment of the trial court.

## I

Before turning to the plaintiff's contention that the trial court improperly rejected his claims, we must first consider the state's claim that the trial court lacked jurisdiction over the plaintiff's action. See *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 134, 680 A.2d 1329 (1996); *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 4, 675 A.2d 845 (1996). The state's principal contention is that S.A. 91-8 violates the prohibition against "exclusive public emoluments or privileges from the community" contained in article first, § 1, of the Connecticut constitution and, consequently, that the claims commissioner lacked authority to entertain the plaintiff's request for permission to sue the state. The trial court concluded that S.A. 91-8 serves a valid public purpose and, therefore, that it does not run afoul of article first, § 1. We agree with the trial court.

To prevail under article first, § 1, of our constitution, the state must demonstrate that "the sole objective of the General Assembly is to grant personal gain or advantage to an individual." *State ex rel. Higgins* v. *Civil Service Commission*, 139 Conn. 102, 106, 90 A.2d 862 (1952). If, however, an enactment serves a legitimate *public* purpose, then it will withstand a challenge under article first, § 1. *Serrano* v. *Aetna Ins. Co.*, 233 Conn. 437, 458–59, 664 A.2d 279 (1995); *Tough* v. *Ives*, 162 Conn. 274, 292, 294 A.2d 67 (1972). Moreover, we conduct our review of S.A. 91-8 mindful that "legislative enactments carry with them a strong presumption of constitutionality, and that a party challenging the con-

present case, the plaintiff, who had ample opportunity to respond to the state's claims in his reply brief, has failed to demonstrate that he was in any way prejudiced by the state's failure to include these claims in its preliminary statement of the issues.

stitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt." *Beccia* v. *Waterbury*, 192 Conn. 127, 133, 470 A.2d 1202 (1984); see also *Faraci* v. *Connecticut Light & Power Co.*, 211 Conn. 166, 168, 558 A.2d 234 (1989).

The plaintiff claims that the trial court lacked authority to consider the propriety of the legislative finding that S.A. 91-8 serves a public purpose because such review is barred by § 4-148 (b), which provides in pertinent part that "[s]uch finding shall not be subject to review by the superior court." See footnote 10. The plaintiff maintains that this legislative prohibition against judicial review is valid because § 4-148 (b) deals with the doctrine of sovereign immunity, and "[i]t is a matter for the legislature, not this court, to determine when our state's sovereign immunity should be waived." *Struckman* v. *Burns*, 205 Conn. 542, 558, 534 A.2d 888 (1987). We disagree. Because an enactment must serve a valid public purpose in order to avoid the prohibition against the granting of "exclusive public emoluments and privileges" contained in article first, § 1, of the state constitution, the determination of whether an enactment serves such a purpose is necessarily one of constitutional magnitude. It is the court's duty to ensure that legislative action falls within constitutional boundaries; *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177–78, 2 L. Ed. 60 (1803); *Szarwak* v. *Warden*, 167 Conn. 10, 27, 355 A.2d 49 (1974); even if that action involves a waiver of the immunity from suit enjoyed by the state under the common law. Consequently, the legislature cannot "by mere fiat or finding, make 'public' a truly 'private' purpose . . . . Its findings and statements about what is or is not 'public' cannot be binding upon the court. *Lyman* v. *Adorno*, [133 Conn. 511, 517, 52 A.2d 702 (1947)]." *Wilson* v. *Connecticut Product Development Corp.*, 167 Conn. 111, 116 n.2,

355 A.2d 72 (1974). Accordingly, § 4-148 (b) would be constitutionally infirm to the extent that it were construed to shield from judicial review a legislative determination that its enactment meets the requirements of article first, § 1, of our state constitution.

The scope of our review as to whether an enactment serves a public purpose is limited. "[W]hat constitutes a public purpose is primarily a question for the legislature, and its determination should not be reversed by the court unless it is manifestly and palpably incorrect." *Barnes* v. *New Haven*, 140 Conn. 8, 15, 98 A.2d 523 (1953); see also *Wilson* v. *Connecticut Product Development Corp.*, supra, 167 Conn. 115–16; *Roan* v. *Connecticut Industrial Building Commission*, 150 Conn. 333, 345, 189 A.2d 399 (1963). "[W]e are not to assess [the constitutionality of an act] in the light of what we think of the wisdom and discernment of the law-making body in the particular instance. Rather we are bound to approach the question from the standpoint of upholding the legislation as a valid enactment unless there is no reasonable ground upon which it can be sustained." *Roan* v. *Connecticut Industrial Building Commission*, supra, 338; see also *Warner* v. *Gabb*, 139 Conn. 310, 313, 93 A.2d 487 (1952). Thus, "if there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy and not of natural justice; and the determination of the legislature is conclusive." *Lyman* v. *Adorno*, supra, 133 Conn. 524. In other words, if we can discern "any conceivable justification for [the] challenged legislation from the public viewpoint"; *Merly* v. *State*, 211 Conn. 199, 205, 558 A.2d 977 (1989); we are bound to uphold it against a constitutional challenge predicated on article first, § 1.

Although "[w]e have taken a broad view of the legislative goals that may constitute a 'public purpose' "; *Beccia* v. *Waterbury*, supra, 192 Conn. 134; "[b]ecause the

elements of a public purpose vary as much as the circumstance in which the term is appropriate, each case must be determined on its own peculiar facts." *Tough* v. *Ives*, supra, 162 Conn. 292. In general, however, we have found "that an act serves a public purpose under article first, § 1, when it promote[s] the welfare of the state . . . or when the principal reason for the appropriation is to benefit the public. . . ." (Citations omitted; internal quotation marks omitted.) *Beccia* v. *Waterbury*, supra, 134; *Wilson* v. *Connecticut Product Development Corp.*, supra, 167 Conn. 117. Furthermore, an enactment will be deemed to serve a valid public purpose, even though it confers a direct benefit upon a particular individual, if it remedies an injustice done to that individual for which the state itself bears responsibility. *Sanger* v. *Bridgeport*, 124 Conn. 183, 189, 198 A. 746 (1938); see also *Chotkowski II*, supra, 213 Conn. 18; *Merly* v. *State*, supra, 211 Conn. 213–14; *Vecchio* v. *Sewer Authority*, 176 Conn. 497, 506–507, 408 A.2d 254 (1979); *Hillier* v. *East Hartford*, 167 Conn. 100, 108–109, 355 A.2d 1 (1974). In such circumstances, the benefit conferred upon a private party by the legislature may be viewed as incidental to the overarching public interest that is served in remedying an injustice caused by the state.[18]

---

[18] By contrast, we have consistently held that legislation seeking to remedy a procedural default for which the state is not responsible does not serve a public purpose and, accordingly, runs afoul of article first, § 1, of the state constitution. See, e.g., *Merly* v. *State*, supra, 211 Conn. 214; *Vecchio* v. *Sewer Authority*, supra, 176 Conn. 506–507; *Hillier* v. *East Hartford*, supra, 167 Conn. 108–109. Thus, legislation cannot survive a constitutional challenge under article first, § 1, if it excuses a party's failure to comply with a statutory notice requirement simply because the noncompliance precludes consideration of the merits of the party's claim. *Merly* v. *State*, supra, 214; *Vecchio* v. *Sewer Authority*, supra, 506–507; *Hillier* v. *East Hartford*, supra, 108–109. As we stated in *Chotkowski II*, supra, 213 Conn. 18, if a statutory notice requirement "could be set aside for the benefit of a particular person simply because the legislature viewed his claim as meritorious, it would be difficult to justify enforcing [the requirement] to bar any claim . . . from being resolved solely on its merits."

In this case, the legislature, acting on the basis of undisputed testimony detailing the circumstances surrounding the plaintiff's failure to file a claim within the period prescribed by § 4-148 (a); see Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1991 Sess., pp. 610–14; expressly found that the plaintiff had failed to comply with § 4-148 (a) "because he was misinformed by a state official and was misled by such official into believing that he had no right of redress against the state for the damages he allegedly suffered." S.A. 91-8; see footnote 1. The legislature further concluded that the plaintiff's request for special authorization to file a late claim with the claims commissioner was supported by "compelling equitable circumstances" and that "such authorization would serve a public purpose." S.A. 91-8; see footnote 1. These conclusions are supported by the testimony presented to the legislature and, as the trial court determined, by the evidence adduced at trial. We cannot conclude, therefore, that the legislative findings and conclusions are manifestly and palpably incorrect.[19]

As noted by the plaintiff, the circumstances of this case are similar to those of *Sanger* v. *Bridgeport*, supra, 124 Conn. 183, in which we upheld the constitutionality

---

[19] The state argues that the legislature could not reasonably have concluded that the plaintiff was warranted in relying on the Rossomando letter and, in any event, that the letter was not misleading because it did not purport to be exhaustive in scope and because it did not expressly indicate that the plaintiff had no remedy before the claims commissioner. As the trial court determined, however, the undisputed facts and reasonable inferences to be drawn therefrom support the express legislative findings and conclusions underlying the enactment of S.A. 91-8. In light of the deference we must accord the legislature in respect to its determination that the challenged legislation serves a public purpose; see *Merly* v. *State*, supra, 211 Conn. 205; *Roan* v. *Connecticut Industrial Building Commission*, supra, 150 Conn. 338; *Lyman* v. *Adorno*, supra, 133 Conn. 524; and because the legislature rationally could have concluded that the plaintiff reasonably relied on the representations contained in the Rossomando letter in failing to seek redress in a timely manner, we must reject the state's claim.

of a special act validating a statutorily defective notice to the city of Bridgeport alleging injuries suffered by the plaintiff due to a defective sidewalk. In *Sanger*, the plaintiff had "alleged that [the defective notice] was prepared by an assistant to the city clerk of Bridgeport, upon whom the plaintiff relied for its preparation and to whom was given all essential facts which were necessary for a notice sufficient to the requirements of the statute . . . ." Id., 185. In concluding that the challenged legislation did not contravene constitutional requirements, we recognized that there exist "strong equitable grounds for legislative interference" when a government official has caused a procedural default that adversely affects the substantive rights of the party seeking legislative intervention. Id., 189; see also *Chotkowski II*, supra, 213 Conn. 18. Here, as in *Sanger*, the challenged special act seeks to remedy an inequity that the legislature rationally concluded had resulted from the plaintiff's reasonable reliance on the misleading conduct of a state official.[20]

The state contends that *Chotkowski II* disposes of the plaintiff's claim that a valid public purpose is served by allowing the plaintiff to prosecute his claim against

[20] Although the state notes that "one commentator has stated that *Sanger* v. *Bridgeport*, supra, [124 Conn. 183] has 'very little vitality' and 'may well not be the law in Connecticut today' "; W. Horton, The Connecticut State Constitution: A Reference Guide (1993) p. 40; the state does not argue that *Sanger* should be overruled. Rather, the state seeks to distinguish *Sanger* from this case on the ground that *Sanger* provided a more compelling factual basis for legislative intervention. In light of the legislative finding that the Rossomando letter misled the plaintiff into believing that he had no recourse against the state, we conclude that this case is indistinguishable from *Sanger* with respect to the factual issue of critical constitutional significance, namely, whether the state caused the procedural default that the legislature sought to remedy. Furthermore, we see no reason to overrule *Sanger* because we perceive no constitutional infirmity in an enactment that reinstates a claimant's right to seek redress against a governmental entity whose employee was responsible for the claimant's noncompliance with a statutory notice requirement promulgated solely for the benefit of that entity.

the state. The state, however, misconstrues the scope of our decision in *Chotkowski II*, wherein the plaintiff disputed the state's constitutional challenge to S.A. 85-24 solely on the ground that equity required the enactment of such remedial legislation in light of the promise of permanent employment allegedly made to him by the state. Thus, as we expressly noted in *Chotkowski II*, "[the plaintiff] does not even claim . . . that the state caused the delay in presenting his claim to the claims commissioner . . . . The only consideration he advances is that the legislature may have intended to recognize an honorary obligation so that substantial justice could be realized. . . . The honorary obligation relied upon by the plaintiff, however, is based wholly upon the asserted merit of his cause of action for breach of contract and does not implicate the delay in filing his claim with the claims commissioner." (Citations omitted; internal quotation marks omitted.) *Chotkowski II*, supra, 213 Conn. 18.

Similarly, nowhere does the legislative history of S.A. 85-24 indicate that the legislature was apprised of the Rossomando letter or of the plaintiff's failure to file a claim in a timely manner in reliance on the representations contained therein. Indeed, because the testimony in support of S.A. 85-24 focused solely upon the alleged merit of the plaintiff's claim against the state; see Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1985 Sess., pp. 1090–92, 1249; we must presume that the enactment of S.A. 85-24 was predicated on that information. Thus, our conclusion in *Chotkowski II* that S.A. 85-24 did not serve a public purpose does not preclude a determination that S.A. 91-8 satisfies that constitutional requirement.

We conclude, therefore, that because S.A. 91-8 serves a legitimate public purpose, it does not violate article first, § 1, of the Connecticut constitution. Accordingly,

the trial court properly rejected the state's constitutional challenge to S.A. 91-8.

## II

We next consider the state's argument that the plaintiff's claim requesting permission to sue the state was barred by § 4-142. See footnote 15. We are not persuaded by this argument.

The claims commissioner has authority to hear all claims against the state except those expressly enumerated in § 4-142. The state first contends that the plaintiff's claim was barred by § 4-142 (1), which excepts from the claims commissioner's jurisdiction "[c]laims for the periodic payment of disability, pension, retirement or other employment benefits." The state further maintains that the plaintiff was entitled to a review of his salary reduction by the personnel appeal board under § 5-202[21] and, consequently, that consideration of his claim by the claims commissioner was precluded by § 4-142 (3), which bars the claims commissioner's review of "claims for which an administrative hearing procedure otherwise is established by law."

The plaintiff's claim that his wages were improperly reduced by the state when he was reclassified to the position of chief of medicine does not fall into either of these two categories limiting the claims commissioner's jurisdiction. With respect to § 4-142 (1), the plaintiff does not claim that he was improperly deprived of a periodic payment of the kind enumerated therein; instead, he seeks lump sum damages for his lost wages. Furthermore, because the plaintiff's action against the state is predicated solely on principles of contract law, it does not appear that the board was authorized under § 5-202 to afford the plaintiff the contract remedy that

---

[21] See footnote 4.

he seeks.[22] We are not persuaded, therefore, that the plaintiff had an available administrative remedy within the meaning of § 4-142 (3). Accordingly, we agree with the trial court that the plaintiff's claim requesting permission to bring this action against the state was not barred by § 4-142.

## III

The state also claims that the plaintiff's request for permission to sue the state was foreclosed by § 4-148 (c), which provides in pertinent part that "no claim once considered by the claims commissioner, by the general assembly or in a judicial proceeding shall again be presented against the state in any manner." See footnote 16. We disagree.

As the state maintains, the principle underlying § 4-148 (c) is that of res judicata. That common law doctrine, also known as "claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim." (Internal quotation marks omitted.) *Delahunty* v. *Massachusetts Mutual Life Ins. Co.*, 236 Conn. 582, 589, 674 A.2d 1290 (1996). Although the state concedes that our judgment in *Chotkowski II* ordering the dismissal of the plaintiff's action did not entail a consideration of the merits of the plaintiff's claim, the state maintains that § 4-148 (c) imposes a broader prohibition against successive claims than does the doctrine of res judicata. Under the interpretation urged by the state, § 4-148 (c) bars a claim against the state if that claim has already been reviewed by the claims commissioner, the legislature or the judiciary whether or not the reviewing body considered the merits of the claim.[23]

[22] Indeed, the Rossomando letter itself indicated that the plaintiff had no administrative recourse with respect to his reclassification to the position of chief of medicine.

[23] Special Act 91-8 (c) expressly provides that "[t]he state shall be barred from . . . setting up the fact that the claim had once been considered by

We reject this interpretation for two principal reasons. First, in the absence of any persuasive reason to the contrary, we are not inclined to construe § 4-148 (c) more narrowly than the common law doctrine upon which it is concededly based.[24] Second, under the state's construction of § 4-148 (c), a claimant whose request for permission to sue the state has been rejected as untimely by the claims commissioner would be precluded from seeking a special act of the legislature waiving the applicable limitation period even though that claimant could have established that the filing delay had been caused by the state.[25] We are not persuaded that the legislature intended such a result. See, e.g., *State* v. *Anonymous*, 237 Conn. 501, 514–15, 680 A.2d 956 (1996) (law favors sensible and rational construction of statute rather than one leading to difficult and possibly bizarre consequences). Accordingly, we reject the state's argument that § 4-148 (c) bars the claims commissioner from considering the plaintiff's claim.

## IV

We now turn to the plaintiff's claim that the trial court improperly rendered judgment for the state on the ground that the plaintiff, as a classified state employee, enjoyed only statutory, and not contractual, employment rights. We agree with the trial court's conclusion.

the claims commissioner, by the general assembly or in a judicial proceeding as defenses to [the plaintiff's] claim." See footnote 1. The state asserts, however, that this provision is itself an "exclusive public emolument" in violation of article first, § 1, of the state constitution because it is not supported by a public purpose. Because we conclude that § 4-148 (c) does not bar a claim against the state when neither the claims commissioner, the legislature nor the judiciary has ever rejected the claim on its merits, the state's argument is unavailing.

[24] The legislative history of § 4-148 (c) sheds no light on its intended scope. See Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., pp. 919–25; 8 S. Proc., Pt. 8, 1959 Sess., pp. 4074–78; 8 H.R. Proc., Pt. 12, 1959 Sess., pp. 5366–67; 8 H.R. Proc., Pt. 13, 1959 Sess., pp. 5582–84.

[25] See part I of this opinion. Indeed, under the view espoused by the state, § 4-148 (c) also would have precluded the enactment of S.A. 85-24.

We have previously concluded that state employees do not have contractual employment rights absent a clear and unambiguous expression of legislative intent to the contrary. *Pineman* v. *Oechslin*, 195 Conn. 405, 416, 488 A.2d 803 (1985); see also *Kinney* v. *State*, 213 Conn. 54, 65 n.17, 566 A.2d 670 (1989). If this were not the case, "the state would be powerless to reduce the pay or shorten the tenure of any state employee without posing a possible contract clause violation. We do not believe that such a heavy obligation may be imposed upon the state unless the legislature clearly evidences an intent to assume it." *Pineman* v. *Oechslin*, supra, 416; see also *National R. Passenger Corp.* v. *Atchison, Topeka & Santa Fe Railway Co.*, 470 U.S. 451, 465–66, 105 S. Ct. 1441, 84 L. Ed. 2d 432 (1985) (absent clear indication by legislature to contrary, presumption is that legislation does not create private contractual rights but merely sets policy to be followed until legislature ordains otherwise). Thus, state employees serve by appointment, and "their entitlement to pay and other benefits 'must be determined by reference to the statutes and regulations governing [compensation], rather than to ordinary contract principles.' " *Kizas* v. *Webster*, 707 F.2d 524, 535 (D.C. Cir. 1983), cert. denied, 464 U.S. 1042, 104 S. Ct. 709, 79 L. Ed. 2d 173 (1984), quoting *United States* v. *Larionoff*, 431 U.S. 864, 869, 97 S. Ct. 2150, 53 L. Ed. 2d 48 (1977). Accordingly, the plaintiff can prevail on his contract claims only if he can establish that the legislature intended to bind the state contractually under the statutory scheme pursuant to which he was appointed. See *Pineman* v. *Oechslin*, supra, 416; see also *Dodge* v. *Board of Education*, 302 U.S. 74, 78, 58 S. Ct. 98, 82 L. Ed. 57 (1937).

The plaintiff points to nothing in the statutes applicable to classified state employees; see General Statutes (Rev. to 1975) §§ 5-200 through 5-208; or elsewhere in our laws and regulations, to support his claim of con-

tractual entitlement. Because his express and implied contract[26] claims are predicated on the existence of rights that he does not possess, the trial court properly concluded that the plaintiff is not entitled to relief on those counts.

The trial court also properly determined that the plaintiff could not prevail on his claim of promissory estoppel. "Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . . It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." (Citations omitted; internal quotation marks omitted.) *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 366, 659 A.2d 172 (1995); see also *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987). "In addition, estoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such

[26] "The [plaintiff's] claim of breach of an implied contract could be read to allege failure to perform duties imposed either by a contract implied in fact or a contract implied in law, also often called quasi-contract." *Therrien* v. *Safeguard Mfg. Co.*, 180 Conn. 91, 94, 429 A.2d 808 (1980). "A contract implied in fact, like an express contract, depends on actual agreement . . . [and a] contract implied in law requires, as a foundation, that there be an obligation created by law that imposes a duty to perform." Id., 94–95. As the trial court concluded, the plaintiff failed as a matter of law to establish the existence of an implied contract because the applicable statutory scheme contains no suggestion that the legislature intended to enter into any contractual relationship with permanent employees in the classified state service. See *Pineman* v. *Oechslin*, supra, 195 Conn. 416.

matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency." *Kimberly-Clark Corp.* v. *Dubno,* 204 Conn. 137, 148, 527 A.2d 679 (1987). Finally, a claim for promissory estoppel will not lie against the state unless "the party claiming estoppel would be subjected to substantial loss if the public agency were permitted to negate the acts of its agents." Id.

The evidence fully supports the trial court's determination that the plaintiff failed to prove his claim of estoppel. The only statement made by state officials to the plaintiff was that "he would be paid $35,000.00 per year, and . . . that said rate of pay would be subject to future increases." As the trial court found, the facts alleged and proven by the plaintiff were "neither sufficiently promissory nor sufficiently definite" to support the plaintiff's claim. See *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* supra, 202 Conn. 214. Moreover, the plaintiff offered no proof that the state officials were empowered to bind the state; see, e.g., *Kimberly-Clark Corp.* v. *Dubno,* supra, 204 Conn. 148; or that the plaintiff exercised due diligence in seeking to ascertain whether they were authorized to do so. See *Connecticut National Bank* v. *Voog,* supra, 233 Conn. 366. Because the plaintiff failed to establish the essential elements of his claim of promissory estoppel, the trial court properly rendered judgment for the state with respect to that count.

The plaintiff contends that his rights vis-a-vis the state are not limited to the statutory rights that he possessed in 1975 because, he claims, § 4-160 places the state in the position of a private person and, therefore, allows any claims that could be brought against a private person to be brought against the state, including claims for breach of an employment contract. It is true that § 4-160 provides for the waiver of the state's sovereign immunity, thus making the state's rights and liability

"coextensive with and equal to those of a private person in like circumstances." *Sullivan* v. *State*, 189 Conn. 550, 557, 457 A.2d 304 (1983). The sole purpose of § 4-160, however, is to remove the bar of sovereign immunity when the claims commissioner determines that it would be "just and equitable" to permit a claimant to seek redress against the state. See footnote 8. Contrary to the plaintiff's claim, there is no indication that the legislature, in empowering the claims commissioner to waive the state's immunity from suit, intended to enhance or otherwise to modify a plaintiff's substantive rights. Consequently, § 4-160 cannot be construed to alter the terms and conditions of the plaintiff's state employment or otherwise affect the fundamental nature of the parties' relationship.[27]

The judgment is affirmed.

In this opinion KATZ, MCDONALD and PETERS, JS., concurred.

BERDON, J., concurring and dissenting. I disagree with part IV of the majority opinion,[1] which states that

[27] In espousing the view that § 4-160 alters the substantive employment rights of the parties, the dissent ignores the plain language of § 4-160 (a), which provides that the "liability of the state in each such action shall be coextensive with and shall equal the rights and liability of private persons in *like circumstances*." (Emphasis added.) It cannot reasonably be maintained that the circumstances underlying the parties' statutorily defined employment relationship are like those underlying a private employment relationship founded on contract. Furthermore, none of the federal or state cases cited by the dissent supports the contention that § 4-160 (a) was intended to expand or to enhance the substantive rights of a claimant who obtains permission to sue the state under that statute. Finally, contrary to the conclusion of the dissent, the pertinent legislative history provides no indication that the legislature, in enacting § 4-160, intended to expand the substantive rights of claimants requesting permission to sue the state.

[1] I agree with part I of the majority opinion, which holds that Special Acts 1991, No. 91-8, does not violate the "exclusive public emoluments" clause of article first, § 1, of the Connecticut constitution. I also agree with parts II and III, which hold that the plaintiff's claim was not barred by General Statutes § 4-142 or § 4-148 and, therefore, the claims commissioner was able to authorize the present action against the state.

by adopting General Statutes § 4-160, the legislature did not intend to enhance the plaintiff's substantive rights against the state. I conclude, on the basis of the plain language of § 4-160, its legislative history, several recent decisions of this court, and the construction of similar statutes by other jurisdictions and the United States Supreme Court, that the state stands in the shoes of a private person, for liability purposes, when the state claims commissioner, pursuant to § 4-160, finds that it is just and equitable to authorize a claimant to bring an action against the state. In other words, if a private person would be liable for the claim, then the state would also be liable. Before setting forth my analysis, it is helpful to put this issue in its historical setting.

Historically, the legislature of this state would grant compensation, through the enactment of special acts, to citizens who were injured or who had other claims against the state. Indeed, prior to 1959, before the legislature created the office of the claims commission, the General Assembly in the first instance considered what action, if any, was appropriate on claims made against the state.[2] That is, the General Assembly either authorized payment of a claim against the state,[3] or authorized an action to be brought against the state in court.[4] The

[2] See, e.g., 1 Private Acts, May Sess., 1845, p.70, under the caption "Orders on the Treasurer," and entitled "Hiram Hawkins," which provides: "Resolved, That the Comptroller of Public Accounts be, and he is hereby authorized and directed to draw an order on the Treasurer, in favor of Hiram Hawkins, for the sum of two hundred and fifty dollars:—the same being in compensation for injuries received by said Hawkins, in the service of this state."

[3] See, e.g., 28 Spec. Acts 514, No. 434 (1957), entitled "An Act Reimbursing Helen B. Bauer of Pomfret," which provides: "The comptroller is directed to draw his order on the treasurer for the sum of five hundred dollars to reimburse Helen B. Bauer of Pomfret for damages sustained by reason of the termination of her contract for services with the welfare department."

[4] See, e.g., 27 Spec. Acts 276, No. 341 (1955), entitled "An Act Authorizing Burgess and Blacher Company To Sue the State," which provides: "Permission is granted to Burgess and Blacher Company of 18 Eustis Street, Boston, Massachusetts, to bring an action against the state to recover damages claimed to have been sustained by it in the construction of additional work

standard for the recompense was whether justice required the state to pay for an injury it had caused. It is important to note that the predicate was not that the state was liable for such compensation, but, rather, that justice and equity required that the state make the payment or that the state respond to an action as if it were a private person. Indeed, in a special act that reflects facts that are strikingly similar to the present case, the legislature, in 1959, authorized a compensatory payment to a state employee because he was relieved of his duties and subsequently reinstated at a lower salary.[5]

It reached a point where the number of claims submitted to the legislature became a major burden and this interfered with the more important function of enacting

performed on the state armory, which work was requested by the state. Any action brought under this act shall be brought on or before the first day of January, 1956, to the superior court at Hartford. The state reserves the right of all legal defenses in such action."

Another act, 29 Spec. Acts 215, No. 228 (1959), entitled "An Act Authorizing Reginald Mitchell To Sue the State of Connecticut and the Highway Commissioner for the State of Connecticut," provides: "Permission is granted to Reginald Mitchell of Seymour, Connecticut, to bring an action against the state of Connecticut and the highway commissioner for the state of Connecticut, for damages caused by a fall on August 30, 1958, on a stair in a building at 78 Raymond Street, Seymour, Connecticut. Such action shall be tried to a court without a jury and no costs or interests shall be included in any judgment against the state. Such action shall be brought on or before the first Tuesday of September, 1959. Neither the statute of limitations nor governmental immunity shall be pleaded as a bar thereto."

[5] See 29 Spec. Acts 214, No. 226 (1959), entitled "An Act Providing for Salary Reimbursement to Thomas J. Foley," which provides: "The comptroller shall draw his order on the treasurer for the sum of eight hundred and sixty dollars to reimburse Thomas J. Foley of Canaan for salary lost from September 1, 1939, to July 1, 1940, when he was relieved of his duties as a state employee by the commissioner of domestic animals and subsequently reinstated at a lower salary. Upon payment to the state employees' retirement fund of twenty-one dollars and fifty two cents plus interest on said account of five percent per annum from the above-mentioned period, the comptroller is directed to compute the retirement status of Thomas J. Foley as though he were not relieved of his duties or did not suffer a reduction in salary during the above-mentioned period."

general legislation.[6] When legislation was proposed by the legislative council[7] to establish a claims commission in order to relieve the General Assembly of a major portion of this burden, its director, George Oberst, explained the need to establish this alternative procedure for the processing of claims in order to ensure that "equity and justice" is done.[8] A statutory procedure for the disposition of claims against the state, to be administered by a claims commission, was adopted by the enactment of Public Acts 1959, No. 685. Subsequently, in 1975, the legislature substituted a claims commissioner (commissioner) for the claims commission. See Public Acts 1975, No. 75-605. Therefore, the commissioner is in reality the conscience of the state, assuming in part the prior role of the legislature to ensure that justice and equity is done. It is the commissioner who now determines what claims should be

[6] See Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., pp. 919–22.

[7] The legislative council was the predecessor of the office of legislative research and the office of fiscal analysis, both of which were created by the joint committee on legislative management. See General Statutes § 2-71c.

[8] In 1959, Oberst testified as follows: "Because of the doctrine of sovereign immunity, the State, unlike most of its citizens, is immune from liability and from suit; that is, without its consent the State cannot be held liable in a legal action for any damage or injury it may cause. By general law, the Governor and the Comptroller have authority to settle claims of a very minor nature. But traditionally it is the duty of the General Assembly to hear and decide the great variety of demands made upon the State for the payment of money. When claims are few in number and the financial outlay is small, legislative determination can function efficiently. But as the number of claims increases and demands upon the treasury grow in size, the legislative process becomes progressively incapable of handling them efficiently. Other more important demands upon the time of legislators and the natural limitations of legislative investigation do not always insure a just determination. This natural inadequacy is further complicated by the fact that some unsatisfied claimants reappear every session with the same claims, forcing the legislature into useless repetition. Despite an earnest desire to honor legitimate claims, there is little to assure the equity and justice which the state rightly demands and which claimants rightly deserve." Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., pp. 919–20.

paid,[9] what claims should be referred to the legislature for payment,[10] or which claimants should be authorized to institute an action against the state.[11]

[9] General Statutes § 4-158 provides: "Jurisdiction of commissioner. Payment of claim. Report to assembly. Waiver of payment on protest to assembly. (a) The Claims Commissioner may approve immediate payment of just claims not exceeding seven thousand five hundred dollars. The clerk of the Office of the Claims Commissioner shall deliver to the Comptroller a certified copy of the Claims Commissioner's order and the Comptroller shall make payment from such appropriation as the General Assembly may have made for the payment of claims or, in the case of contractual claims for goods or services furnished or for property leased, from the appropriation of the agency which received such goods or services or occupied such property. Within five days after the convening of each regular session, the Claims Commissioner shall report to the General Assembly on all claims decided pursuant to this section.

"(b) Any person who, having filed a claim for more than seven thousand five hundred dollars, wishes to protest an award of the Claims Commissioner under the provisions of this section may waive immediate payment and his claim shall be submitted to the General Assembly under the provisions of section 4-159. Such waiver shall be in writing and shall be filed with the Claims Commissioner within ten days after the claimant receives a copy of the order approving payment."

[10] General Statutes § 4-159 provides: "Recommendations for payments in excess of seven thousand five hundred dollars. Action by General Assembly. After hearing, the Claims Commissioner shall make his recommendations to the General Assembly for the payment or rejection of amounts exceeding seven thousand five hundred dollars. Within five days after the convening of each regular session and at such other times as the speaker of the House of Representatives and president pro tempore of the Senate may desire, the Claims Commissioner shall submit such recommendations to the General Assembly, together with a copy of his findings and of the hearing record of each claim so reported. The General Assembly may (1) accept or alter any such recommendation or (2) reject any such recommendation and grant or deny the claimant permission to sue the state. *The General Assembly may grant the claimant permission to sue the state under the provisions of this section when the General Assembly deems it just and equitable and believes the claim to present an issue of law or fact under which the state, were it a private person, could be liable.*" (Emphasis added.)

[11] General Statutes § 4-160 provides in relevant part: "Authorization of actions against the state. (a) *When the Claims Commissioner deems it just and equitable, he may authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable.*

"(b) In each action authorized by the Claims Commissioner pursuant to subsection (a) of this section or by the General Assembly pursuant to section

The basis for the plaintiff's claim that he filed with the commissioner, and upon which he was authorized to bring an action, can be crystallized as breach of contract and promissory estoppel.[12] The state argued before the commissioner that Special Acts 1991, No. 91-8, the act that validated the plaintiff's untimely notice of claim, was unconstitutional and beyond the

4-159, the claimant shall allege such authorization and the date on which it was granted. *The state waives its immunity from liability and from suit in each such action and waives all defenses which might arise from the eleemosynary or governmental nature of the activity complained of. The rights and liability of the state in each such action shall be coextensive with and shall equal the rights and liability of private persons in like circumstances. . . .* " (Emphasis added.)

[12] The plaintiff's odyssey through the courts and legislature produced, in addition to the present action, two other actions, two special acts, and a public act that created a new provision in the General Statutes. See *Chotkowski* v. *Connecticut Personnel Appeal Board*, 176 Conn. 1, 6, 404 A.2d 868 (1978) (*Chotkowski I*) (affirming trial court holding that plaintiff was permanent employee in classified state service for purposes of General Statutes § 5-202 [a]; subsequently, parties agreed to settlement of plaintiff's termination claim); Special Acts 1985, No. 85-24 (S.A. 85-24) (validating late filing of notice with commissioner of claim for plaintiff's lost wages); *Chotkowski* v. *State*, 213 Conn. 13, 18–19, 566 A.2d 419 (1989) (*Chotkowski II*) (holding that S.A 85-24 constituted prohibited "exclusive public emolument" given to plaintiff in violation of article first, § 1, of Connecticut constitution and ordering dismissal for lack of subject matter jurisdiction); Public Acts 1990, No. 90-284, § 3 (codified as General Statutes § 4-148 [b], which provides that legislature may authorize person to present claim to commissioner after time limitation has run provided that legislature "deems such authorization to be just and equitable and makes an express finding that such authorization is supported by compelling equitable circumstances and would serve a public purpose"; new provision in General Statutes was crafted in this manner so as to avoid constitutional "exclusive public emoluments" problem that plaintiff faced in *Chotkowski II*, and circumstances surrounding plaintiff's claim against state was catalyst for this new legislation, as is apparent from plaintiff's testimony before the judiciary committee in support of bill); Special Acts 1991, No. 91-8 (authorized plaintiff to present lost wage claim to commissioner once again, but this time legislature made legislative finding, pursuant to § 4-148 [b], that because plaintiff was misinformed and misled by state official regarding his state employment dispute, there were compelling equitable circumstances to support such authorization and that public purpose would be served by allowing such authorization). This appeal presents the plaintiff's third visit to this court with respect to his employment with the state.

commissioner's jurisdiction. Because of this argument, the commissioner, instead of adjudicating the claim himself pursuant to General Statutes § 4-158 or making a recommendation to the legislature of an amount for payment pursuant to General Statutes § 4-159, authorized the plaintiff to institute this action pursuant to § 4-160.

The trial court, finding that *Pineman* v. *Oechslin*, 195 Conn. 405, 488 A.2d 803 (1985),[13] was controlling, rejected the plaintiff's breach of contract claim against the state. Also, the trial court, in finding that the requirements to hold a public agency responsible based upon promissory estoppel were not met; see *Kimberly-Clark Corp.* v. *Dubno*, 204 Conn. 137, 148, 527 A.2d 679 (1987);[14] *Pineman* v. *Oechslin*, supra, 415;[15] also

[13] The trial court relied on the following from *Pineman*: "Although there is a seductive appeal in the contract-oriented approaches adopted by other jurisdictions, we decline to depart from the well established rules of statutory construction discussed earlier, namely, that a statute does not create vested contractual rights absent a clear statement of legislative intent to contract." *Pineman* v. *Oechslin*, supra, 195 Conn. 414.

[14] The trial court relied on the following from *Kimberly-Clark Corp.*: "[E]stoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency. . . . As noted, this exception applies where the party claiming estoppel would be subjected to substantial loss if the public agency were permitted to negate the acts of its agents. [I]t is the burden of the person claiming the estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." (Citations omitted; internal quotation marks omitted.) *Kimberly-Clark Corp.* v. *Dubno*, supra, 204 Conn. 148.

[15] The trial court also relied on the following from *Pineman*: "The promissory estoppel approach, in focusing attention on the reasonable expectations of the employee, ignores the distinction traditionally made between private and public entities in determining the existence of contractual rights and obligations. '[C]ourts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel.' *Kizas* v. *Webster*, 707 F.2d 524, 535 (D.C. Cir. 1983). This distinction can be viewed as another way

rejected that claim. Neither the trial court nor this court are correct in relying on *Pineman* and *Kimberly-Clark Corp.*, because those cases were direct actions against the state and are not relevant to the standards that must be applied once an action has been authorized by the commissioner.[16] Indeed, the majority's entire analysis is predicated on *Pineman*[17] and *Kimberly-Clark Corp.*,[18] without any recognition that in neither of those cases did the commissioner authorize an action against the state pursuant to § 4-160.

This present action against the state must be viewed through the lens of § 4-160,[19] upon which the commissioner predicated his order. Our rules of statutory construction are clear. If words of a statute are clear, the duty of a reviewing court is to apply the legislature's directive. "[T]he meaning of [a] statute must, in the first instance, be sought in the language in which the act is framed . . . . If the language of the statute is clear, it is assumed that the words themselves express the intent of the legislature . . . . Where [a] statute presents no ambiguity, we need look no further than the words themselves which we assume express the intention of the legislature." (Citations omitted; internal quotation

of articulating the requirement of an express legislative intent to contract." *Pineman* v. *Oechslin*, supra, 195 Conn. 415.

[16] For the purposes of this case, I do not disagree that under *Pineman* and *Kimberly-Clark Corp.*, the plaintiff cannot succeed in his claims against the state. Nevertheless, once the commissioner (the conscience of the state) makes a determination that it is just and equitable to authorize an action against the state, it becomes a whole new ball game. *Pineman* and *Kimberly-Clark Corp.*, under the circumstances of those cases, have no relevance in the present case because the action against the state here is as if it were against a private person.

[17] *Pineman* was a class action. *Kinney* v. *State*, 213 Conn. 54, 566 A.2d 670 (1989), also relied on by the majority, was an appeal from the workers' compensation commission to the compensation review division, which then reserved certain questions of law.

[18] *Kimberly-Clark Corp.* was an appeal from the commissioner of revenue services.

[19] See footnote 11 of this dissent.

marks omitted.) *White* v. *Burns*, 213 Conn. 307, 311, 567 A.2d 1195 (1990).

The clear words of § 4-160 provide that once an action is authorized by the commissioner, the liability of the state is to be determined as if the action were against a private person—if a private defendant would be liable, then so would the state. The plain words of § 4-160, as indicated in the following italicized portions of the statute, demonstrate this point. Subsection (a) provides: "When the Claims Commissioner deems it just and equitable, he may authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, *were it a private person, could be liable.*" (Emphasis added.) Subsection (b) provides: "In each action authorized by the Claims Commissioner pursuant to subsection (a) of this section or by the General Assembly pursuant to section 4-159, the claimant shall allege such authorization and the date on which it was granted. The state waives its immunity from liability and from suit in each such action and waives all defenses which might arise from the eleemosynary or governmental nature of the activity complained of. *The* rights and *liability of the state in each such action shall be coextensive with and shall equal the* rights and *liability of private persons in like circumstances.*" (Emphasis added.) The identical "were it a private person" standard is found in the last sentence of § 4-159, which applies to the General Assembly when it is deciding whether to grant a claimant permission to bring an action against the state. If the legislature did not make it clear in subsection (a) of § 4-160 that the liability of the state, once the commissioner deemed "it just and equitable," was to be coextensive with that of a private person, it was made crystal clear in subsection (b) of that statute, which provides, in pertinent part, that the "liability of the state . . . shall be coextensive with and shall equal the . . . lia-

bility of private persons in like circumstances." "Coextensive" is defined as "having the same scope or boundaries . . . ." Webster's Third New International Dictionary; see also General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language").

The majority states that the "sole purpose of § 4-160 . . . is to remove the bar of sovereign immunity . . . ." This, however, is accomplished by the second sentence in § 4-160 (b), which waives such defenses on the part of the state. Under the majority's reading of the statute, there would be no purpose for the language in subsection (a) of § 4-160, which sets forth the "were it a private person, could be liable" standard, or, more importantly, for the third sentence in subsection (b), which provides that the "liability of the state in each such action shall be coextensive with and shall equal the . . . liability of private persons in like circumstances." "There is a presumption of purpose behind every sentence, clause or phrase in a legislative enactment so that in construing it no part is treated as insignificant and unnecessary." (Internal quotation marks omitted.) *Zichichi* v. *Middlesex Memorial Hospital*, 204 Conn. 399, 407, 528 A.2d 805 (1987); see also *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 347, 680 A.2d 1261 (1996) ("[w]e presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions" [internal quotation marks omitted]). In addition, "the use of different words in the same enactment must indicate a difference in legislative intention." *Steadwell* v. *Warden*, 186 Conn. 153, 164, 439 A.2d 1078 (1982) (*Shea, J.*, dissenting). It is clear that it was the legislature's intention to make the state liable as if it were a private person once the commissioner authorized an action pursuant to § 4-160,

and, in doing so, the legislature leveled the playing field by also giving the state the same rights (including defenses) in such litigation as a private person.

The legislative history, as indicated by Oberst, whose office drafted the statute at the direction of the 1953 legislature, clearly indicates that its intent was that once the permission to bring an action against the state was granted by the claims commission, the state's liability would be coextensive with that of a private person. Litigants regularly brought actions in court against state employees and officers because sovereign immunity barred such actions brought directly against the state, and those state employees and officers could be held liable on the same basis as a private person. Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., p. 922. In justifying No. 685, § 25, of the 1959 Public Acts, the portion of the act that would grant immunity to state employees and would force claims for the conduct of employees to be disposed of by the proposed claims legislation, Oberst testified that "[w]ith the state providing its citizens with a just and equitable means of presenting claims [as a result of the claims commission legislation], continuing the liability of state employees appears unnecessary and, in practice, constitutes a burden on state employment. Such a provision [providing immunity for state officers and employees] has been included in the proposal recommended by the Council."[20] Id.

---

[20] The present version of the statute is found in General Statutes § 4-165, which provides: "Immunity of state officers and employees from personal liability. No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter. For the purposes of this section 'scope of employment' shall include, but not be limited to, representation by an attorney appointed by the Public Defender Services Commission as a public defender, assistant public defender or deputy assistant public defender or an attorney appointed by the court as a special assistant public defender

This court has clearly indicated that once the commissioner authorizes a claimant to bring an action against the state, pursuant to § 4-160, the state's liability is coextensive with that of a private person. In *Tamm* v. *Burns*, 222 Conn. 280, 281–82, 610 A.2d 590 (1992), the plaintiff sought damages against the state claiming a taking of his land under the state constitution because of the "state's operation of a truck inspection and weigh station on its property, which [was] adjacent to his [property], [that] caused additional noise, unsightliness and air pollution on his property . . . ." The court found that the inverse condemnation allegations did not support a traditional taking that would trigger the state constitution, but, rather, the allegations did show a substantial interference with the plaintiff's property. Id., 285–86. The court held that it need not decide whether a substantial interference with property rights reaches the level of a constitutional taking under a more expansive view of the state constitution, because the plaintiff failed to exhaust his administrative remedies by not seeking, among other things, permission from the commissioner to bring an action for damages against the state pursuant to § 4-160. Id., 288–90. In *Tamm*, the court reasoned that another remedy had been available to the plaintiff as follows: "In accordance with article eleventh, § 4, of the Connecticut constitution, the Gen-

of an indigent accused or of a child on a petition of delinquency, representation by such other attorneys, referred to in section 4-141, of state officers and employees, in actions brought against such officers and employees in their official and individual capacities, the discharge of duties as a trustee of the state employees retirement system, the discharge of duties of a commissioner of Superior Court hearing small claims matters or acting as a fact-finder, arbitrator or magistrate or acting in any other quasi-judicial position, and the discharge of duties of a person appointed to a committee established by law for the purpose of rendering services to the Judicial Department; provided such actions arise out of the discharge of the duties or within the scope of employment of such officers or employees. For purposes of this section, members or employees of the soil and water district boards established pursuant to section 22a-315 shall be considered state employees."

eral Assembly has established the office of the . . . commissioner, granting to the . . . commissioner the power to waive the state's sovereign immunity when he 'deems it just and equitable' and to authorize suit 'on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable.' General Statutes § 4-160 (a)." *Tamm* v. *Burns*, supra, 289–90.

Likewise, in *Doe* v. *Heintz*, 204 Conn. 17, 35–36, 526 A.2d 318 (1987), this court acknowledged that in actions authorized by the commissioner under § 4-160, the state's liability to the claimant is coextensive with that of a private person. The plaintiffs in *Doe* sought attorneys' fees from the state with respect to litigation in which they had successfully compelled the state to fund abortions requested by women eligible for state medical assistance. Id., 18–19. The court, in determining whether the plaintiffs failed to exhaust their administrative remedies by not seeking relief from the commissioner, stated: "Our determination in part I [of the opinion] that a private party in the same position as the state in this case would not have been liable for attorneys' fees would render fruitless an authorization to sue the state, because its liability in such a suit is 'coextensive' with that of a private person [pursuant to § 4-160 (a)]." Id., 36. Nevertheless, the court concluded that the plaintiffs had failed to exhaust their administrative remedies because they could have sought relief from the commissioner under his authority to grant compensation pursuant to other statutory provisions. Id., 36–37.

Finally, in *Sullivan* v. *State*, 189 Conn. 550, 457 A.2d 304 (1983), the plaintiff challenged the constitutionality of General Statutes § 4-165, which prohibits an action against a state employee. The court refused to resolve the question because the plaintiff failed to exhaust her administrative remedies by not seeking permission to

sue the state from the commissioner pursuant to § 4-160. Id., 559. The court stated that "[i]n such authorized actions the rights and liability of the state are coextensive with and equal to those of a private person in like circumstances." Id., 557. Similarly, this court pointed out in *Fidelity Bank* v. *State*, 166 Conn. 251, 254, 348 A.2d 633 (1974), where the plaintiff's direct action against the state based on negligence was dismissed, that a claim could have been presented to the claims commission and that if the action were permitted, the state's liability would have been coextensive with and equal to the liability of a private person.

Other jurisdictions have considered similar "private person" standards in their tort claims acts and have held that recovery is to be allowed against the state if recovery would be allowed against a private party. See *Reddish* v. *Smith*, 468 So. 2d 929, 932 (Fla. 1985) ("recovery is to be allowed [against the state] only to the extent that such is available against a private person for the same kind of conduct"); *Barringer* v. *State*, 111 Idaho 794, 801, 727 P.2d 1222 (1986) (stating that, under state's Tort Claims Act, "the state waives sovereign immunity and subjects itself to the *same liability as would attach to a private person*" [emphasis added]); *Sterling* v. *Bloom*, 111 Idaho 211, 216, 723 P.2d 755 (1986) ("The statute says that *if* a private person would be liable for the misconduct alleged against the government, regardless of whether the private individuals ordinarily fill the same underlying function or role of the government, so will be the government. In other words, if a *cause of action* would lie against a private individual, it will also lie against the government." [emphasis in original]); *Denis Bail Bonds, Inc.* v. *State*, 159 Vt. 481, 486, 622 A.2d 495 (1993) ("governmental liability may arise only if a plaintiff's cause of action is comparable to a cause of action against a private citizen . . . and his allegations, taken as true, [will] satisfy the necessary

elements of that comparable state cause of action" [internal quotation marks omitted]).

Indeed, during the period in the 1950s when our legislature was considering whether to create a claims commission, the United States Supreme Court, in 1955, decided *Indian Towing Co.* v. *United States*, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955), under the Federal Tort Claims Act. In *Indian Towing Co.*, the court stated that "[t]he broad and just purpose which the [Federal Tort Claims Act] was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which *a private person would be liable* and not to leave just treatment to the caprice and legislative burden of individual private laws." (Emphasis added.) Id., 68–69.[21] The claim in *Indian Towing Co.* was for damages to a vessel that ran aground due to the United States Coast Guard's alleged negligence in not maintaining the beacon light in a lighthouse. Id., 62. The Supreme Court addressed the government's argument as follows: "[T]he Government contends that the language of the [Federal Tort Claims Act] imposing liability 'in the same manner and to the same extent as a private individual under like circumstances . . .' must be read as exclud-

---

[21] In *Indian Towing Co.* v. *United States*, supra, 350 U.S. 63, the court quoted the Federal Tort Claims Act as follows: "The relevant provisions of the Federal Tort Claims Act are 28 U.S.C. [§] 1346 (b) [which provides that] 'the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant* in accordance with the law of the place where the act or omission occurred . . . [and] § 2674 [which provides that] '[t]he United States shall be liable . . . *in the same manner and to the same extent as a private individual under like circumstances,* but shall not be liable for interest prior to judgment or for punitive damages.'" (Emphasis added.)

ing liability in the performance of activities which private persons do not perform. Thus, there would be no liability for negligent performance of 'uniquely governmental functions.' The Government reads the statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.' But the statutory language is 'under like circumstances,' and it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner.

"Furthermore, the Government in effect reads the statute as imposing liability in the same manner as if it were a municipal corporation and not as if it were a private person, and it would thus push the courts into the 'non-governmental'-'governmental' quagmire that has long plagued the law of municipal corporations. . . . The Federal Tort Claims Act cuts the ground from under [the] doctrine [of sovereign immunity]; it is not self-defeating by covertly embedding the casuistries of municipal liability for torts." Id., 64–65. The Supreme Court has subsequently relied on its decision in *Indian Towing Co.* See *Sheridan* v. *United States*, 487 U.S. 392, 401, 108 S. Ct. 2449, 101 L. Ed. 2d 352 (1988); *Berkovitz* v. *United States*, 486 U.S. 531, 538 n.3, 108 S. Ct. 1945, 100 L. Ed. 2d 531 (1988).

As recently as 1983, the United States Supreme Court stated, in the context of an indemnity action brought by an airplane manufacturer against the United States as a result of the death of a civilian employee of the armed forces in a military airplane crash, that "[t]he Federal Tort Claims Act permits an indemnity action against the United States 'in the same manner and to the same extent' that the action would lie against 'a private individual under like circumstances.' " *Lockheed Aircraft Corp.* v. *United States*, 460 U.S. 190, 198, 103 S. Ct. 1033, 74 L. Ed. 2d 911 (1983).

Finally, it makes eminent sense that once the commissioner, as the conscience of the state, makes a determination that it is "just and equitable" to grant a claimant permission to sue the state, the state's liability is coextensive with that of a private person. For example, in this case, after the finding by the commissioner that justice requires that the state respond to the claims of the plaintiff, it would make no sense for this court to then deny the claim because there is, with respect to an employee contract, no such recognized cause of action against the state or because of an extraordinary showing that must be made in an action brought against the state based on promissory estoppel. The legislature simply wanted to provide that if a claim is authorized by law against a private person, and the plaintiff can prove each element required for liability against a private person under such cause of action (subject, of course, to the state being able to exert any such defenses that a private person would have), then damages should be awarded. The commissioner does not authorize every claimant to bring an action against the state, but, rather, only those claimants with claims that are deemed "just and equitable." See *Circle Lanes of Fairfield, Inc.* v. *Fay*, 195 Conn. 534, 535–36, 489 A.2d 363 (1985) (commissioner refused to permit claimant to bring action against state for damage to plaintiff's property as result of alleged negligence of state in causing flooding).

The nature of the state's liability in any action brought pursuant to the commissioner's permission under § 4-160 is a legislative determination. The majority, without any analysis, summarily proclaims that the language of § 4-160—that provides that the state's liability will be as if it were "a private person" and that the "rights and liability of the state in each such action shall be coextensive with and shall equal the rights and liability of private persons in like circumstances"—does not

mean what it says. This failure on the part of the majority to give effect to the clear intent of the legislature tramples on the separation of powers clause set forth in article second of the state constitution. No court should be "a self-constituted guardian of the Treasury [and] import immunity back into a statute designed to limit it." *Indian Towing Co.* v. *United States,* supra, 350 U.S. 69.

Accordingly, I dissent.[22]

[22] I would reverse and remand the case to the trial court for a new trial wherein the state's liability would be coextensive with that of a private person. In other words, if, under the facts found by the trial court, a private person would be liable under the law of contract or, in the alternative, under the law of promissory estoppel, then the state should be similarly liable for damages.