[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: APPLICATION FOR TEMPORARY INJUNCTION
At this point in time, the ultimate issue for the court to decide is whether the plaintiff's application for a temporary CT Page 10256 injunction should be granted. The contract containing the restrictive covenants at issue, described therein as unique, and subject to injunctive relief, also contains an arbitration clause. When the hearing began, the defendant questioned the court's subject matter jurisdiction. After the plaintiff filed for arbitration, the parties were in agreement that the court had subject matter jurisdiction of the temporary injunction proceeding pursuant to General Statutes § 52-422.
 I
At the hearing, the facts set forth below were proved.
The plaintiff is a corporation that does telemarketing. It's basic activities are in three areas, controlled circulation, providing aid to business organizations through surveys and publications and fund raising. The principal activity by far, however, is controlled circulation, a procedure in which the plaintiff aids a publisher to increase the circulation of a publication by surveys conducted on the telephone. An increase in circulation makes a publication more attractive to advertisers. The plaintiff has three phone-in centers, two are in Branford and one is in Meriden. One of the office in Branford serves as corporate headquarters. At any given time, the plaintiff has twenty to twenty-four full-time employees. Up to 300 people have been employed on a part-time basis depending on the length and breadth of a particular survey. The plaintiff's employees refer to the surveys conducted by means of the telephone as "campaigns".
There is competition in telemarketing. Occasionally a customer will use more than one telemarketer for a survey. But usually the various services compete for the same clients. List of present and past clients are circulated by telemarketers in efforts to attract new customers. One of the plaintiff's principal competitors is a firm known as Mark Facey Co. (hereinafter Facey) located in Bristol. The plaintiff and Facey attend the same trade shows.
The defendant went to work for the plaintiff on June 15, 1987. Previously the defendant had worked for the New Haven Register where she was circulation marketing promotion manager. Telemarketing for the newspaper was one of her responsibilities. When the plaintiff was conducting a survey for the Register, the defendant became acquainted with Robert Lester, the plaintiff's CT Page 10257 president.
The defendant was hired as an account executive. As an account executive (hereinafter AE) the defendant had the dual responsibilities of holding on to existing clients and attracting new ones. When the defendant was hired, there was no written contract. She and Robert Lester, however, discussed a written contract containing covenants not to compete.
Not until November of 1987, was a written employment contract presented to the defendant for her signature. The contract was a standard one required of all of the plaintiff's employees who work in the category of sales. Paragraph 15 of the contract contains the restrictive covenants that are at issue.
 15. Restrictive Covenants. The AE agrees that during the period of his employment hereunder and for an additional period two years after the date of termination for whatever reason of such employment, the will not without the prior written consent of LTI:
 (A) Become an employee of, enter into any contract with, or be retained in any capacity by any client of LTI for the purpose of rendering to any such client any services similar to an in competition with those provided or offered by LTI;
 (B) Become an employee of, enter into any contract with, or be retained in any capacity by any person or firm which renders or provides to any client of LTI any services similar to and in competition with those provided or offered by the Corporation;
 (C) Accept employment with or enter into a contract with any person or firm which offers services similar to and in competition with those provided or offered by LTI in any geographical area or to any category of clients to which the AE was at any time assigned by LTI during the term of this agreement;
 (D) Influence or attempt to influence any client or prospective client of LTI from declining to purchase any services from LTI; or
 (E) Accept employment with or enter into a contract with any person or firm which offers services similar to and in CT Page 10258 competition with those provided or offered by LTI within a radius of fifty (50) miles of any office than maintained by LTI.
 Any violation of this paragraph by the AE while still in the employment of LTI shall be cause for immediate dismissal of the AE, in addition to any other legal or equitable remedies which may be available to LTI against the AE
After having the contact reviewed by a local attorney and being informed by him that the restrictive covenants were probably overboard and unenforceable, the defendant signed the contract on November 22, 1987. A refusal to sign would have terminated her employment. She was appointed as Director of Sales and other AEs reported to her. Her base salary was increased from $20,000.00 to $40,00.00. Commissions were also paid upon her sales at a rate of 3%. Later the defendant was made a vice-president of the plaintiff. After the written contract was executed, the defendant's basic duties did not change. Her commissions increased, however, as she brought in or was assigned more clients. As the plaintiff's chief AE in a competitive business, the defendant had to be aware of current prices which changed all the time. She was privy to confidential telephone conversations and she knew and still knows the names and addresses of the clients with whom she has done business. The defendant also represented the plaintiff at various trade meetings, conferences and exhibitions.
Robert Lester, the plaintiff's president, wants to merge the plaintiff into another organization or to sell the plaintiff. A firm specializing in mergers and acquisitions known as Texada Capital Corporation has been hired for this purpose. A limited number of employees, including the defendant, were told of Lester's plans. Pasco, an Ohio corporation, had expressed an interest in purchasing the plaintiff and signed a letter of intent. As part of their investigation of the plaintiff, representatives of Pasco spoke to the defendant for approximately twenty minutes. Before hiring Texada, Capital Corporation, Lester asked the defendant if the plaintiff could buy the five shares of its stock which the defendant had been given.
One suggestion given to the plaintiff by Texada Capital Corporation was that new written contracts be executed by the plaintiff's employees. The commission schedule in schedule A of the written contract was no longer in effect at least as far as CT Page 10259 the defendant's compensation was concerned. It was at this time that Robert Lester discovered that the could not locate the defendant's contract. He found it one week after the defendant had resigned in the company warehouse. When the defendant quit, she was making between base salary and commissions, from $90,000.00 and $100,000 per year.
The defendant had worked for the plaintiff for almost eleven years before she resigned. Her letter of resignation was dated May 4, 1998 with an effective date of May 15, 1998. No reasons for her action were stated in the letter. At trial, however, she gave as reasons that she had to turn away customers because the plaintiff did not have a sufficient number of people qualified to make the telephone calls; that if the plaintiff were sold, her future would become uncertain; and that she wanted to move on with her life. The plaintiff notified Texada who, in turn, informed Pasco of the defendant's resignation. The fact that the defendant was no longer an employee was not proven to be a determining factor in Pasco's present disinterest in purchasing the plaintiff.
Back in April, 1998, the defendant contracted Facey. After talking to Mark Facey himself, the defendant was hired at a yearly salary of $120,000.00 commencing June 1, 1998. When the defendant delivered her letter of resignation, she did not mention having been hired by Facey and said only that she had two opportunities for employment. Robert Lester reminded the defendant that future employment opportunities were limited by the restrictive covenants in her contract.
At Facey the defendant's title is customer services manager. She reports directly to Jeff Nistadt, a Facey executive, or to Mark Facey. The defendant admitted however that she was hired by Facey as a person who present and prospective customers could contact, basically the same duties that she had with the plaintiff. The defendant's testimony that presently she is only dealing with Facey's existing customers and not soliciting new ones is not wholly accurate. In July or August, 1998, the defendant flew to San Francisco, California in the company of other Facey personnel. There they visited two clients of Facey that also used the plaintiff's services. The defendant told the two clients that she had been ready for a change and was now with Facey. At a recent trade meeting reception, the defendant informed representatives of publishers who presently are or have been customers of the plaintiff, that she was now working for CT Page 10260 Facey, and the defendant has called some of the plaintiff's present clients and told them of her change of jobs.
The defendant is sufficiently valuable to Facey for it to have underwritten her legal representation. In no other field of employment could the defendant command the salary that she is being paid by Facey.
 II
In deciding the issue posed by this case, the court will not be writing on a clean slate. Numerous decisions from both trial and appellate courts refer to the principles governing temporary injunctions and their relationship to restrictive covenants in employment contracts.
There is, however, an aspect of this case that should be settled first. One of the defendant's contentions is that the plaintiff has misrepresented Beit v. Beit, 135 Conn. 195 (1948) as authority for the proposition that the provisions of paragraph 15, ante, should be treated in a divisible manner rather than as a unitary whole. According to the defendant, the plaintiff is attempting to have the court rewrite the contract of the parties. The court agrees that the plaintiff's reference to Beit v. Beit,supra, 135 Conn. 195 is only a quotation by the Supreme Court from Pollock's treatise on contracts. But the court disagrees with the defendant's premise that paragraph 15 should be construed as one unit rather than as separate covenants not to compete.
A proper quotation from Beit v. Beit, supra would be "[W]hether the promises in a contract will be treated as severable or not is primarily a matter of the intent of the parties, determined by a fair construction of all the provisions of the contract." 135 Conn. 205. Not only do subparagraphs (A) through (E) of paragraph 15 purport to prohibit separate acts, paragraph 20 of the contract contains a separability clause. The court holds that the intent or the parties was to have the various prohibitions of paragraph 15 considered as severable.
A second preliminary issue is whether the contract is supported by consideration. Before the written agreement was signed, the defendant was an employee at will. See Magnan v.Anaconda Industries, Inc., 193 Conn. 558, 563 (1984). Her status was not changed by the written agreement which despite all its CT Page 10261 verbiage contains no definite term of employment. see Coelho v.Posi-Seal International, Inc., 208 Conn. 106, 118 (1988). The court credits the testimony of Robert Lester that if the defendant refused to sign the written contract with its restrictive covenants, her employment would have been terminated. Under the circumstances of this case, the defendant's continued employment by the plaintiff was consideration for the written contract. The continuous employment of the defendant did not, therefore, render her various promises not to compete "nudem pactum" as a subsequent written contract was found to be in Timenterial, Inc.v. Dagata, 29 Connecticut Sup. 180, 186 (1971).
 III
A trial court is vested with broad discretion in determining whether or not an application for a temporary injunction should be granted. Bauer v Waste Management of Connecticut Inc.,239 Conn. 515, 535 (1996); Branch v. Occhionero, 239 Conn. 199, 206
(1996). Griffin Hospital v. Commission on Hospitals HealthCare, 196 Conn. 451, 459 (1985). Generally four factors are involved. The court must decide that (1) the plaintiff has no adequate legal remedy; (2) the plaintiff would suffer irreparable injury of the injunction were not granted; (3) the plaintiff has shown a reasonable probability of success on the merits; and (4) the balancing of equities favors the grant of a temporary injunction. Waterbury Teachers Association v. Freedom ofInformation Commission, 239 Conn. 441, 446 (1994).
Provisions in a contract that restrict or prohibit an employee's future employment are agreements to restrain trade. The test of the validity of such provisions is the reasonableness of the restraints that are imposed. To meet this test successfully, the restraints must be limited in their operations with respect to time and place, afford no more than fair and just protection to the party in whose favor they are to operate and not duly interfere with the public interest. Mattis v. Lally,138 Conn. 51, 54 (1951). Public interest or more properly public policy requires that an individual's liberty of action in trading or employment not be unduly restricted. Samuel Stores, Inc. v.Abrams, 94 Conn. 248, 255 (1919). Under some circumstances, equity will hold invalid contracts that are so broad in application that they prevent an individual from carrying on his usual vocation and earning a livelihood. Mattis v. Lally, supra,138 Conn. 56
CT Page 10262
In the two New Haven Tobacco Co. v. Perrelli cases,11 Conn. App. 636 (1987) and 18 Conn. App. 531 (1989) the Appellate Court formalized the more general language used by the Supreme Court inScott v. General Iron Welding Co., 171 Connecticut 132, 137 (1976), and other cases. Now there is a five-prong test to be used in determining whether restrictive covenants pass the tests of reasonableness: (1) the length of time the restriction is to be in effect; (2) the geographic area covered by the restriction; (3) the degree of protection afforded to the employer; (4) the restrictions on the employees ability to pursue his occupation; and (5) the extent of interference with the public's interests.11 Conn. App. 638-39 n. 2; 18 Conn. App. 533-34. The court believes that proper procedure requires first that the five-prong test be applied to each of the covenants of paragraph 15 ante of the contract. All or any that pass muster will then be examined in light of the criteria required for the issuance of a temporary injunction. The five-pronged criteria is to be viewed as disjunctive rather than conjunction. A finding of unreasonableness in any one of the prongs is enough to render a covenant unenforceable. New Haven Tobacco Co. v. Perrelli,supra, 18 Conn. App. 534; New Haven Tobacco Co. v. Perrelli,Supra, 11 Conn. App. 639 n. 2.
As an introduction to the specific subparagraphs, paragraph 15, ante makes each subject to a period of time of two years following termination of employment. A time period of this length was held to be reasonable in Torrington Creamery, Inc. v.Davenport, 126 Conn. 515, 581, 520 (1948); May v. Young,125 Conn. 1, 4-5 (1938) and more recently in Robert S. Weiss Associates v. Wiederlight, 208 Conn. 525, 530-31 (1988). A time period of two years is also reasonable here. The court finds that much of the plaintiff's business was due to the dynamism of the defendant.
A problem exists, however, with respect to subparagraph (A) and continues through subparagraphs (B)(C) and (D). Subparagraph (A) prohibits the defendant, inter alia, from entering into any contract with any of the plaintiff's clients for services similar to or in competition with those offered by the plaintiff. Subparagraph (B) prohibits the plaintiff from becoming an employee of any of the plaintiff's competitors. Subparagraph (C) prohibits the defendant from accepting employment with any firm in competition with plaintiff in any geographical area or to any category of clients to which the plaintiff was assigned by the plaintiff during the term of the written contract. CT Page 10263 Subparagraph (D) prohibits the defendant from influencing or attempting to influence even a prospective client of the plaintiff to decline a service offered by the plaintiff. The vice that is common to all of these subparagraphs, whether read individually or collectively, is that they prohibit the defendant from employment by Facey or any other competitors without any geographical limitation. These restrictions are not at all like the covenant that was upheld in May v. Young, supra, 125 Connecticut 3, 7 which prohibited an ex-employee from soliciting the plaintiff's then existing customers in his former territory which was the entire country cast of the Mississippi River. Nor is it similar to the five year restriction upheld in Scott v.General Iron Welding Co., supra, 171 conn. 137-38, where the prohibition was limited to the former employee participating in the management of a business of the type conducted by the employer within the State of Connecticut. Inescapable conclusions are that subparagraphs (A)(B)(C) and (D) are unenforceable because their lack of a geographical limitation, overprotects the former employer and unduly restricts the former employee. Scottv. General Iron Welding Co., 171 Conn. 132, 138 (1976);Trans-Clean Corp. v. Terrell, 21 CONN. L. RPTR. 420, 423 (1998).
Nor are the above restrictions made reasonable by incorporating into them, by "blue-lining" or otherwise, the limitation of a fifty mile radius from Branford or Meriden as set forth in subparagraph (E). Two interpretations are possible from the wordage in subparagraph (E). First, a prohibition against being hired by a competitor whose place of business was within the proscribed area. This construction would certainly include Facey with its headquarters in Bristol. Second, a prohibition against entering into a contract, perhaps for consulting services, with Facey or another competitor. From the evidence; however; neither interpretation places subparagraph (E) within the bounds of reasonableness. The court has learned that Facey and the plaintiff share one or two clients in California. Robert Lester mentioned the names of some clients but not their locations in his testimony. The court is bereft of knowledge as to clients within the fifty mile radius. The general rule is that the application of a restrictive covenant will be confined to a geographical area that is reasonable in a particular situation. "A restrictive covenant which protects the employer in areas in which the does not do business or is unlikely to do business is unreasonable with respect to area." Scott v. General Iron Welding Co., supra 171 Conn. 138; Trans-Clean Corp v. Terrell,supra, 21 CONN. L RPTR. 223. Because the court has concluded that CT Page 10264 the restrictive covenants are unreasonable and, therefore, unenforceable, there is no need to consider further the feasibility of a temporary injunction.
 IV
The plaintiff's contention that the defendant should be equitably from claiming that the restrictive covenants are unenforceable is singularly in apposite. The defendant signed an employment contract that was one of adhesion prepared by or for the defendant. She then worked for the plaintiff, presumably under the contract for eleven years. Neither inducement nor reliance, the two essential elements of estoppel, Chotkowski v.State, 240 Conn. 246, 268 (1997) is present here.
 V
The plaintiff's application for a temporary injunction is denied.
Barnett, J