[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF APPEAL
The plaintiff, George Frank, appeals from the decision of the defendant, the Weston Zoning Board of Appeals. The Zoning Board of Appeals upheld a cease and desist order issued by the Zoning Enforcement Officer.
 BACKGROUND
On or about October 29, 1985, Frank purchased and received title to real property located at 112 Georgetown Road, Weston, Connecticut (the premises). (Supplemental Return of Record [ROR], Exh. 11: 2/24/98 Transcript (Tr.), p. 13). Frank also received title to the personalty located on the premises, an assignment of the business known as Georgetown Gardens, and an assignment of the trade name certificate. (Supplemental ROR, Exh. 11: 2/24/98 Tr., p 13) Frank purchased the property from the estate of David Bedell, the previous owner of the property. (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 13; ROR, Exh. 5).
Frank went to the Weston building department to obtain permits to build a barn on the property; and he then applied to the Planning and Zoning Commission (Commission) for a special permit. (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 14). On December 9, 1985, Frank appeared before the Commission and the Commission told him that, based on the facts as he represented them, he could continue the business without a special permit, unless he employed additional people. (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 14; ROR, Exh. 5).
On or about December 29, 1997, the Code Enforcement Officer (CEO) for the Town of Weston issued a cease and desist order against the premises for violations of §§ 301,[1] 321[2]
and 342 of the Zoning Regulations of the Town of Weston CT Page 5788 (Regulations). The cease and desist order was based upon Frank's illegal home occupation and operation of a commercial enterprise in a residential zone. (ROR, Exh. 2)
On or about January 28, 1998, Frank appealed the cease and desist order to the Zoning Board of Appeals (ZBA). (ROR, Exh. 1). The ZBA conducted a hearing on February 24, 1998. The ZBA upheld and affirmed the cease and desist order.
Frank now appeals from the ZBA's decision to the Superior Court on the ground that the decision was arbitrary, capricious, illegal, irrational and an abuse of discretion.
 JURISDICTION
General Statutes § 8-8 governs appeals taken from the decisions of a zoning board of appeals to the superior court. A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created. Bridgeport Bowl-O-Rama, Inc. v. Zoning Board,195 Conn. 276, 283, 487 A.2d 559 (1985)
Aggrievement
Pleading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of a plaintiff's appeal. Jolly, Inc. v. Zoning Board of Appeals,237 Conn. 184, 192, 676 A.2d 831 (1996). An owner of the subject property is aggrieved and entitled to bring an appeal. WinchesterWoods Associates v. Planning Zoning Commission, 219 Conn. 303,308, 592 A.2d 953 (1991). Aggrievement must be pleaded, as well. Frank alleges that he is the record owner of the property known as 112 Georgetown Road. (Complaint, ¶ 1).
At the hearing on February 10, 1999, this court found that Frank is the record owner of the property located at 112 Georgetown Road, Weston, Connecticut and is therefore aggrieved.Timeliness and Service of Process
General Statutes § 8-8 (b) provides, in pertinent part, that an "appeal shall be commenced by service of process in accordance with subsections (e) and (f) of this section within fifteen days from the date that notice of the decision was published as required by the general statutes." Subsection (e) further provides that service "shall be made by leaving a true CT Page 5789 and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality."
Frank alleges that notice of the ZBA's decision was published on March 5, 1998. (Complaint, ¶ 6). Although the record does not include an affidavit of publication, the record contains an item entitled "Legal Notice" setting forth the decision and requesting the Weston Forum to publish the decision on March 6, 1998. (ROR, Exh. 9). On March 19, 1998, this appeal was commenced by service of process on the Chairman, the Clerk and the Secretary of the ZBA, as well as the Assistant Town Clerk of Weston. (Sheriff's Return.) Consequently, the instant appeal was commenced in a timely fashion by service of process upon the proper parties.
 SCOPE OF REVIEW
A zoning board hears and decides an appeal from the decision of a zoning enforcement officer "de novo." Caserta v. ZoningBoard of Appeals, 226 Conn. 80, 88-89, 626 A.2d 744 (1993). It is the board's responsibility, pursuant to the statutorily required hearing, to find the facts and to apply the pertinent zoning regulations to those facts. In doing so, the board is endowed with a liberal discretion. It follows from the de novo nature of the board's consideration of the issues decided by the zoning enforcement officer that the trial court, upon a judicial appeal from the board pursuant to General Statutes § 8-8, must focus on the decision of the board and the record before it, because it is that decision and record that are the subject of the appeal under § 8-8. Id., 90-91.
Where a zoning agency has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. Bloom v. Zoning Board of Appeals,233 Conn. 198, 208, 658 A.2d 559 (1995). Under this traditional and long-standing scope of review, the proper focus of a reviewing court is on the decision of the zoning agency and, with regard to its factual determinations, on the evidence before it that supports, rather than contradicts, its decision. Caserta v.Zoning Board of Appeals, supra, at 87. CT Page 5790
As previously stated, the ZBA upheld the CEO's issuance of the cease and desist order on the ground that Frank violated §§ 301 and 321 of the Regulations by virtue of the illegal operation of a commercial enterprise in a residential zone. Frank appeals on the grounds that: (1) the ZBA improperly reconsidered and vacated the December 9, 1985 action of the Commission (Complaint, ¶ 9(a)); (2) Frank relied upon the Commission's recognition of "the pre-existing nonconforming commercial uses at the premises" and otherwise "relied on said action." (Complaint, ¶ 4); and (3) the ZBA acted arbitrarily, illegally and in abuse of its discretion (Complaint, ¶ 9(b) — (h))
I. Whether the ZBA improperly reconsidered and vacated theDecember 9, 1985 action of the Commission
Frank asserts that because the December 9, 1985 meeting constituted a hearing and decision by the Commission, the ZBA improperly reconsidered and modified the Commission's purported decision recognizing a pre-existing nonconforming use at the premises. Frank further argues that the ZBA used "the public testimony from the February 24th 1998 public hearing as a benchmark for the Commission's action of December 9th 1985." (Plaintiff's Brief, p. 13). Frank argues that the ZBA accepted the public testimony given at the February 24, 1998 hearing, wherein the nonconforming use was portrayed as being less commercialized than it was when presented and approved by the Commission in 1985. (Plaintiff's Brief, p. 13)
The ZBA argues that Frank's reliance on the December 9, 1985 "action" is without foundation. (ZBA's Brief, p. 13). The ZBA argues that the minutes from the December 9, 1985 meeting reveal that the matter concerning Frank and Georgetown Gardens was simply open for discussion and that no formal action was taken on it. (ZBA's Brief, p. 13).
Frank's argument is without merit because no "action" was taken at the December 9, 1985 meeting and consequently there was no decision to reconsider or vacate. At the February 24, 1998 hearing, the Chairman of the Commission, Mr. Noyes, stated that: "This, these minutes from the Planning and Zoning Commission, first of all, it was not a decision made. That was just a discussion." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 21).
The ZBA further argues that no vote was ever taken on December 9, 1985. (ZBA's Brief, p. 13). At the February 24, 1998 CT Page 5791 hearing, Frank's attorney, Christopher Vaugh, stated "[t]he fact that a business was recognized in 1985 speaks of one decision by the board that a pre-existing nonconforming use existed there." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 15). Attorney Vaugh incorrectly stated at the February 24, 1998 hearing that the Commission made a decision at the 1985 meeting regarding the pre-existing nonconforming use. The Commission made no such decision but, at most, informally discussed the matter. The record contains the minutes from the December 9, 1985 Commission meeting. With respect to Frank's matter, the minutes contain a heading entitled "Former Georgetown Gardens/Andy Frank — Discussion." (ROR, Exh. 5). The minutes reveal that Frank was merely "advised that he can continue the business without a Special Permit unless he employs additional people." (ROR, Exh. 5). Because no decision was made at the December 9, 1985 meeting, there was nothing for the Commission to vote on.
II. Whether Municipal Estoppel applies to the facts of thisappeal
Frank argues that "the doctrine of municipal estoppel precludes [the ZBA] from revoking or invalidating [t]he Commission's recognition and approval for [t]he Plaintiff's continuation of the non-conforming business use of [t]he Premises." (Plaintiff's Brief, p. 8). Frank also argues that he received permission from the Commission to continue to use the premises to run the business known as "Georgetown Gardens" without a special permit unless he employed additional people. (Plaintiff's Brief, p. 2). According to Frank, the premises [have] historically been used, and [are] presently being used, for the business of providing landscape service and design, and the sale of landscape related materials." (Plaintiff's Brief, p. 2). Frank further maintains that, in reliance upon the Commission's action of December 9, 1985, he expended thousands of dollars in building a barn on the premises. (Plaintiff's Brief, p. 9).
The ZBA argues that: (1) Municipal estoppel is not applicable because it would result in a "clear zoning violation"; and (2) even if municipal estoppel did apply, Frank has not met its requirements. The ZBA contends that the December 9, 1985 "action" taken by the Commission was merely an informal discussion. (ZBA's Brief, p. 13). The ZBA notes that the only information before the Commission in 1985 regarding the Bedell business came from Frank. (ZBA's Brief, p. 14). The ZBA further argues that Frank fails to CT Page 5792 meet the requirement that he exercised due diligence to ascertain the truth about the nature of the Bedell business. (ZBA's Brief, p. 15).
Only in a very limited number of extraordinary situations have courts recognized that a municipality may be estopped from enforcing its regulations. Dornfried v. October Twenty-Four,Inc., 230 Conn. 622, 635, 646 A.2d 772 (1994); Gelinas v. WestHartford, 225 Conn. 575, 590, 626 A.2d 259 (1993); see also Shawv. Redding Zoning Board of Appeals, Superior Court, judicial district of Danbury, Docket No. 330006 (June 8, 1998, Radcliffe,J.).
 "In municipal zoning cases . . . estoppel may be invoked (1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulations." Bauer v. Waste Management of Connecticut, Inc., 234 Conn. 221, 247, 662 A.2d 1179 (1995).
Thus, in order for a court to invoke municipal estoppel, the aggrieved party must establish that: (1) an authorized agent of the municipality had done or said something calculated or intended to induce the party to believe that certain facts existed and to act on that belief; (2) the party had exercised due diligence to ascertain the truth and not only lacked knowledge of the true state of things, but also had no convenient means of acquiring that knowledge; (3) the party had changed its position in reliance on those facts; and (4) the party would be subjected to a substantial loss if the municipality were permitted to negate the acts of its agents. Id.
Frank asserts that the first prong of municipal estoppel, that an authorized agent of the municipality did or said something calculated or intended to induce him to believe that certain facts existed and to act on that belief, is established because he relied on the December 9, 1985 "action" by the Commission. At the December 9, 1985 meeting, Frank said "that he would use the land to grow trees." (ROR, Exh. 5). Frank "advised that he had bought the trade name, that the business was pre-existing zoning regulations." (ROR, Exh. 5). Frank further stated at the meeting that "he would like to take down an existing shed and garage on the road and build a new garage." (ROR, Exh. 5). The minutes of the meeting reflect that "Mr. Frank CT Page 5793 was advised that he [could] continue the business without a Special Permit unless he [employed] additional people." (ROR, Exh. 5).
Frank asserts that based on the aforementioned advice at the December 9, 1985 meeting, he obtained a building permit to build a barn on the property. (Plaintiff's Brief, p. 9). At the February 24, 1998 hearing, Frank claimed that "I'm relying, I'm relying, I'm relying on these minutes at this point." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 10). "What I have is from December 9, 1985. I went in and relied upon that. Now you're coming back to me 13 years later and telling me that we have a problem. The time to question that was before I went forward in 1985, before you gave me a permit to build a barn. I invested thousands, thousands of dollars." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 27). At the ZBA hearing, Attorney Vaugh stated that the board decided at the 1985 meeting that a pre-existing nonconforming use existed at Georgetown Gardens. (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 11).
The ZBA argues that there is evidence contradicting both Frank's interpretation of the minutes as well as Attorney Vaugh's statements. The ZBA further argues that the first prong of municipal estoppel is not met because, even if Frank relied on advice given by the Commission, that advice was based on erroneous facts presented by Frank himself. In the Commission minutes from the 1985 meeting, Frank advised the Commission "that the business was pre-existing zoning regulations." (ROR, Exh. 5). Based on Frank's representations, the Commission "advised" Frank that he could continue the business without a special permit "unless he [employed] additional people." (ROR, Exh. 5). Also, in the corrections to the minutes of December 9, 1985, a Commission member "determined that no permit existed for this business between 1970 — 83: There is a possibility that it was a pre-existing business to the Zoning Regulations." (ROR, Exh. 5).
This court agrees with the appellee that Frank has failed to meet the first prong of municipal estoppel, i.e., a resulting violation was unjustifiably induced by the agent having the authority in such matters. The minutes indicate that Frank advised the Commission that the business was a pre-existing use, not vice versa. Furthermore, the corrections to the minutes specifically state that there is a "possibility" that it was a pre-existing business. The board members merely had informal discussions about the use of the property at Georgetown Gardens CT Page 5794 and did not take a vote. In addition, the minutes further reveal that the Georgetown Gardens matter was labeled merely a "Discussion."
However, even if the court concluded that the Commission's "advice" to Frank induced him to believe that a pre-existing nonconforming use existed on the premises, the record nevertheless reveals that Frank has not met his burden of demonstrating that he exercised due diligence to ascertain the true state of affairs.
Frank maintains that he has met the "due diligence" prong of municipal estoppel by his reasonable and diligent steps in 1985 to ascertain the nature of the lawful uses which were permitted at the premises. (Plaintiff's Brief, p. 9). Frank further maintains that these reasonable and diligent steps included (1) applying to the building department of the town of Weston and to the Commission in order to obtain permits to build a barn on the premises and (2) filling out an application for a special permit and attending the Commission meeting held on December 9, 1985. (Plaintiff's Brief, p. 9). Moreover, Frank asserts that he had limited information regarding the business use of the premises, and that he lacked convenient means to obtain additional, complete information. (Plaintiff's Brief, p. 9). Frank contends: "The death of [his] predecessor in title, ie Bedell, negated [t]he Plaintiff's ability to obtain additional information regarding the nature and extent of the pre-existing use of [t]he Premises." (Plaintiff's Brief, p. 9).
The ZBA contends that Frank has failed to meet his burden of showing that he exercised due diligence to ascertain the truth about the nature of the Bedell business, and to relay that truth to the Commission. (ZBA's Brief, p. 16). The ZBA argues that: (1) Frank's physical examination of the premises would have alerted him to the absence of commercial activity on the premises for a long period of time; (2) a check with any of the zoning authorities would have revealed that zoning regulations affecting two acre zones went into effect in 1953; and (3) discussions with the neighbors would have revealed that the premises were solely residential prior to 1966. (ZBA's Brief, p. 16)
It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge. CT Page 5795Chotkowski v. State, 240 Conn. 246, 268, 690 A.2d 368 (1997). To determine whether Frank has exercised due diligence, it is necessary to look at the totality of the circumstances.
The record reflects that at the February 24, 1998 hearing, Frank claimed that "[a]s far as I know, the guy Dave Bedell was a landscape, a landscape architect, did landscape design work." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 15). "I bought everything. He was dead and I got the whole shebang. I think he did a lot of landscaping work, big estates, that kind of thing. The best that I could tell." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 15-16). Frank also claimed that prior to purchasing the premises, he talked "to the guy, with the Colonel. He was the head of Zoning. I talked to him before I even bought it. I met with him and had a discussion with him. He told me it's been there, not to worry about it basically. And I went forward and I bought the property. . . ." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 30-31)
Attorney Vaugh stated at the February 24, 1998 hearing that "[t]here's nothing on file that I was able to locate that would define the parameters of the business as it existed in 1985, apart from Mr. Frank's testimony and his recollection." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 18-19). Attorney Vaugh further stated that "I recognize it's difficult because there's an absence of hard information to rely on. We have Mr. Frank's recollection. There are no minutes that I am aware of or at least transcripted minutes of the meetings from 1985 available." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 35). Attorney Vaugh did introduce a letter from a Weston resident, Bobby Eike Mullen, in which she says that "she's lived at 26 Samuelson Road for 23 years and has seen a business, ongoing business there. It is clear that in 85 there was an ongoing business. There is an ongoing business now." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 19, 30-31; ROR, Exh. 6).
Statements given at the February 24, 1998 hearing support the ZBA's position that Frank had not exercised due diligence. A letter from Betty and Theodore Coley, two of Frank's neighbors, reveals that: "When he bought the property it was not a going business. Mr. Bedell had a nursery, but had retired sometime before, so it was not active. Mr. Frank brought in heavy equipment and dug in the wet lands and deepened his pond and enlarged the sign. . . . By digging the pond deeper he took our vain of water to our only 40 yr. hand dug well away. We were CT Page 5796 without water for over 4 months. . . . Mr. Frank then built a large truck garage with possible apt. over head on that formerwet lands. . . . If he is let to use this property as a commercial property, why shouldn't I return to a `1,000 rabbitfarm' and continue the old ear business. Why should we conform to the Town and not Mr. Frank. . . ." (Emphasis in original) (ROR, Exh. 7). In regard to the letter from Betty and Theodore Cooley, Noyes, Chairman of the Weston ZBA, stated that "[t]he observation of this letter is that when he bought the property it was not a going business." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 36).
At the February 24, 1998 hearing, Noyes stated that "[t]he pre-existing doesn't mean that it pre-existed your ownership. It means that it pre-existed the zoning regulations in 1953. And at that time a William Samuelson was the owner. Do you have any record, or could you report on what William Samuelson was conducting on the property?" (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 27). Frank's response was: "No, not with me at this point. No." (Supplemental ROR, Exh. 11: 2/24/98 Tr., 27). After Frank completed his presentation, the Commission opened the floor to the public. One member of the public stated that the property was used strictly as a residence prior to the transfer to Bedell. (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 40).
In addition, the following colloquy took place. Mr. Samuelson: "My name is Eric Samuelson. My family owns the piece of property that is adjacent to the property in question. Just, I'd like to give a brief history of the property as I view it and what I found in my research of the property. At 112 Georgetown Road, that property was first owned by a Samuelson in the late 1800's. It remained in the family from father to son and to brother up until 1966, and that would be November of 1966. At that point in time the property was sold to Bedell."
Board Member: 66?
Mr. Samuelson: 1966, November of 66. That's im the land records. Up until the transfer of that property in 1966 from a member of my family to Mr. Bedell, it was used strictly as a residence. There was no farming, nursery activity or any other activity that could be construed as a commercial type of activity. It was used H strictly as a residence. Then in . . . the records are really lax as far as what happened, but once Bedell bought the property there is no permits, granting of variances or any other type of official record of that becoming a formal commercial property CT Page 5797 when Bedell took it over. The only thing that I could find was in the minutes of a 1973 meeting that indicated that Bedell could fill in a rear portion of the property for garden purposes. And that was the only reference other than draining of a pond in the back, or some land in the back, that was referenced to any activities by Bedell."
Mr. Noyes: "What body has this record . . .?"
Mr. Samuelson: "This is a Planning Zoning minutes.
Specifically, there were three meetings. The dates were May 7, 1973, May 14, 1973 and June of 1973. So up until that time the property had visually remained much the same. There was activity on the property as far as flowers and so forth. . . . There was the house, obviously. There was a garage, a single car garage. There was an outhouse and there was a small building in the back of the house which is called the summer kitchen by my family. . . ." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 41-42).
According to Samuelson, "[the premises] is not nonconforming and pre-existing according to the regulations. . . . [referring to the December 9, 1985 minutes], it's obvious that the discussion [regarding whether a pre-existing nonconforming use existed] wasn't completed on December 9. There was still an open question to be answered . . . It was never used as a commercial piece of property previous to sometime between 1966 and 1973." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 41, 46). Samuelson further remarked upon what was on the premises prior to 1966. "It was the residence, the house, a one-car garage, a building, small shed, and an outhouse. That was pretty much it. A small lawn around, around the house." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 48)
Paula Savignol, a neighbor of the premises since 1977, claimed that in 1977, the premises was "[p]retty much what Mr. Samuelson was describing." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 49). Tom McNamara, a neighbor since 1982, described the premises during his first couple of years "as being dead, nothing happening there at all, nothing by way of retail. . . . Certainly my feeling is that pre-existing nonconforming has to be interpreted the way the Town has always interpreted it, meaning not pre 85 but pre zoning." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 50, 52). CT Page 5798
Another neighbor, Diana Samuelson-Buttery stated that "I'm here to verify what my brother Eric [Samuelson] and the people over here said that pre-1985 there was no commercial activity on that property and there was no heavy equipment. I do recall, it may have been late 70's, there may have been a pickup truck of some sort there but otherwise there was nothing else there. I can verify that for you. . . . He [Bedell] may have had a little garden there but there were no flowers there that were sold. And as far as trees, previous to 1980 there was nothing planted there in the back or anything else. It was just about as it was, the same condition before he purchased it with a little back house and the summer kitchen and just about everything was the same as when my Uncle [owner of premises prior to Bedell] sold it. . . . He [Bedell] did not formally conduct any business. He wanted to and as a matter of fact, he approached our family to purchase the property adjacent to that, to grow these trees. But that didn't, that never came about. And I do have personal knowledge because I bought that property with a surveyor previous to 1980 and there was nothing different than when my uncle sold it." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 53-55). Chairman Noyes then said to Ms. Buttery: "Which was residential." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 55). Ms. Buttery responded: "Yes." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 55).
Robert McDermott, a neighbor for approximately twelve years, spoke regarding Frank's reliance on the minutes from the December 9, 1985 hearing. He commented that "it seems to imply that at the top of the letter [referring to the minutes] they refer to the Bedell business and then they refer to `the business' afterwards. . . . And that document seems to imply `the business' was the Bedell business. And therefore the subsequent statement that you can continue to operate `the business' implied the Bedell business. . . . So I think you're [the board] correct in your interpretation that you have to look at what did Bedell do versus what did Mr. Frank do. . . . Further when we did move here and that was about 12 years ago, we were curious that the sign said Georgetown Gardens. I went to Georgetown Gardens to buy shrubbery for my new house and they did not sell any nursery things at all. You couldn't buy shrubs, you couldn't buy flowers or anything. . . . I believe we asked them about the sign, they said it looks nice so they kept it up there." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 59-61).
Debra McCarthy, another neighbor, indicated that "[i]n 1985, CT Page 5799 August, we were looking to buy a home and upon buying our house that property appeared to have nothing at all going on. . . . And in, when we closed in November of 1985 it still looked like there was nothing going on. I couldn't go buy plants or shrubs or it just looked like the sign was there for no reason whatsoever. I just, you know, thought it was very odd that there'd be a sign there for a nursery or a gardens, and there was no sign of anything happening. . . . So, to me . . . I don't know how there's a pre-existing business when there didn't appear to be a business, you know, when we had purchased the home." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 62-63).
Furthermore, at the February 24, 1998 hearing, Frank was asked whether Bedell had trucks or mulch at the premises. Frank's response was: "When I got there he was dead. I don't know what he had. But I would imagine there was mulch. There was some mulch there, but he was more into selling trees." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 16).
It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth or lacked any reasonably available means of acquiring knowledge.Chotkowski v. State, 240 Conn. 246, 268, 690 A.2d 368 (1997) Frank has failed to show that he has exercised due diligence to discover the truth about the premises in question. The record reflects that, although Frank claimed he lacked knowledge regarding the previous use of the property, there were convenient avenues available for him to acquire such knowledge. For example, the statements made by the neighboring landowners indicate that they were aware of Bedell's use of the property, and Frank could have spoken to them to ascertain what the property contained during Bedell's ownership. The record reflects that the only information Frank presented was one letter from Bobby Eike Mullen, a nearby resident in the town of Weston. Moreover, the statements made by neighbors at the public hearing demonstrate that if Frank had in fact exercised due diligence, he would have been able to uncover history about the previous owners of the premises in question and the business conducted by the previous owners.
Frank has failed to satisfy the "due diligence" requirement and therefore may not avail himself of the doctrine of municipal estoppel.
III. Whether the ZBA acted arbitrarily, illegally and in abuse of
CT Page 5800its discretion.
Finally, Frank argues that the ZBA acted illegally, arbitrarily and in abuse of discretion. (Plaintiff's Brief, p. 10). The CEO determined that Frank was in violation of §§ 301 321 of the Regulations and therefore must cease and desist from operating a commercial enterprise in a residential zone. The ZBA affirmed the cease and desist order. Frank argues that the ZBA failed to delineate the parameters of the nonconforming use and distinguish the nonconforming use from his alleged impermissible expansion. (Plaintiff's Brief, pp. 11-12). Frank further argues that the ZBA must define the alleged expansion or enlargement which was found to exist as of December 29, 1997. (Plaintiff's Brief, p. 12).
The ZBA argues that when Frank appeared before the Commission in 1985, the premises were not legally nonconforming. (ZBA's Brief, p. ii). The ZBA further argues that even if the court recognizes a pre-existing nonconforming use on the premises, there is substantial evidence in the record to support the finding that Frank has illegally expanded the use on the premises. (ZBA's Brief, p. 17)
It is fundamental black letter law that:
 "The plaintiff shoulders the burden of proof when challenging a decision of an administrative agency. . . . [T]he plaintiff must establish that substantial evidence does not exist in the record to support the agency's decision. . . . Should substantial evidence exist in the record to support any basis or stated reason for the agency's decision, the court must decision." (Citations omitted.) Keiser v. Conservation Commission, 41 Conn. App. 39, 41, 674 A.2d 439 (1996).
The reviewing court may grant relief from the agency's decision only where the decision is "arbitrary, illegal or not reasonably supported by the evidence." Keiser v. ConservationCommission, supra, 41 Conn. App. 41, quoting Red Hill Coalition,Inc. v. Conservation Commission, 212 Conn. 710, 718,563 A.2d 1339 (1989).
To determine whether the ZBA acted arbitrarily, illegally and in abuse of its discretion, the court must first consider whether Frank has satisfied his burden of establishing a pre-existing nonconforming use. A nonconformity is defined as a "use or CT Page 5801 structure prohibited by the zoning regulations but is permitted because of its existence at the time that the regulations are adopted." Adolphson v. Zoning Board of Appeals, 205 Conn. 703,710, 535 A.2d 799 (1988). Nonconforming uses are protected by General Statutes § 8-2, which provides that zoning regulations "shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations." General Statutes § 8-2. It is a general principle in zoning that nonconforming uses should be abolished or reduced to conformity as quickly as the fair interest of the parties will permit. In no case should they be allowed to increase. Bauer v. Waste Management of Connecticut,Inc., supra, 234 Conn. 243.
The burden of establishing the existence of a valid nonconforming use as of the effective date of the zoning regulation is on the property owner. Pleasant View FarmsDevelopment, Inc. v. Zoning Board of Appeals, 218 Conn. 265, 272,588 A.2d 1372 (1991). The rule concerning the continuance of a nonconforming use protects the right of a user to continue the same use of the property as it existed before the date of the adoption of the zoning regulations. Helbig v. Zoning Commission,185 Conn. 294, 306, 440 A.2d 940 (1981); Cioffoletti v. Planning Zoning Commission, 24 Conn. App. 5, 8, 584 A.2d 1200 (1991).
General Statutes § 8-2 protects the right of a user to continue the same use of the property as it existed before the date of the adoption of the zoning regulations. Such a use is permitted because its existence predates the adoption of the zoning regulations. It is well established that to be a nonconforming use the use must be actual. It is not enough that it be a contemplated use or that the property was bought for the particular use. Bauer v. Waste Management of Connecticut, Inc., supra, 234 Conn. 240. For a use to be considered nonconforming that use must possess two characteristics. First, it must be lawful and second, it must have been in existence at the time that the zoning regulation making the use nonconforming was enacted. Cummings v. Tripp, 204 Conn. 67, 91, 527 A.2d 230
(1987). The second requirement necessitates a showing that the premises must be so utilized as to be known in the neighborhood as employed for a given purpose. Helicopter Associates, Inc. v.Stamford, 201 Conn. 700, 713, 519 A.2d 49 (1986).
To satisfy his burden of proving the pre-existing nonconforming use, Frank has relied solely on the "advice" given CT Page 5802 to him at the December 9, 1985 meeting. Attorney Vaugh stated at the February 24, 1998 hearing that "I don't think this Board would be properly reviewing incidents which occurred before December 9, 1985 to determine whether or not the pre-existing use existed. It was recognized in 1985 and I think this Board is pretty much stuck with that recognition at this point in time for want of a better word." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 19). Attorney Vaugh also testified that "I think what really existed on December 9, 1985 is the critical issue for tonight because that's when he [referring to Frank] was before the board. . . . It's clear that a business had to have been by definition a pre-existing nonconforming use in 1985." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 24, 33).
Contrary to Attorney Vaugh's aforementioned statement, Chairman Noyes commented "I think the question is not what he [referring to Frank] did but did Bedell do prior. Isn't that what we're really talking about here? What was going on prior to 85 that you are a continuation of." (Supplemental ROR, Exh. 11: 2/24/98 Tr., pp. 23-24). Noyes further stated that "[t]he pre-existing doesn't mean that it pre-existed your ownership. It means that it pre-existed the zoning regulations in 1953." (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 27). Furthermore, Snaith, one of the board members, stated that "a nonconforming use is what stems from whoever first had it, through Bedell to you (Supplemental ROR, Exh. 11: 2/24/98 Tr., p. 25). Various neighbors spoke at the hearing regarding the premises. As previously set forth, however, the record reflects that the premises have not been used as commercial property since the adoption of the Regulations. See text, supra, part II.
Toward the conclusion of the February 24, 1998 meeting, Board Member Snaith stated: "Where did this mysterious pre-existing condition come from? Nobody knows about it and it's stated that Frank bought the business and that the business was pre-existing the zoning regulations. Bedell buys the property in 66, zoning was 53. The Samuelsons state that it was a residence until they sold it to Bedell. So, where did this pre-existing condition come from? . . . I think they [the Commission] just took his word for it." (Supplemental ROR, 2/24/98 Exh. 11: Tr. p. 72). This conclusion is supported by the language of the minutes and corrected minutes. (ROR, Exh. 5).
Based on the aforementioned record, Frank has failed to satisfy his burden of establishing any pre-existing nonconforming CT Page 5803 use. To the contrary, the record demonstrates that while Bedell stayed within the confines of what is permitted in this residential area pursuant to the Regulations, Frank has not. Frank has transformed the premises into a commercial use.
Accordingly, for all of the foregoing reasons, the ZBA properly upheld the cease and desist order and Frank's appeal must be and is hereby dismissed.
MELVILLE, J.