[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Plaintiff initiated this action to recover damages pursuant to a written thirty-six month lease for the subject premises located at 716 Windsor Street, First Floor, Hartford, Connecticut. The complaint alleges that defendant failed to take possession of the subject premises after required work was completed by plaintiff and defendant refused to make the rental payments required under the lease. Plaintiff claims damages for unpaid rent, compensation for renovation costs associated with the installation of a handicap accessible bathroom and ramp, new carpeting, environmental inspections and work completed.
Defendant contends that the lease is not binding on it since the plaintiff failed to complete necessary repairs that would trigger the Commencement Date in the lease. Defendant counterclaims to recover its security deposit and payment of the first month's rent. Both parties claim costs and reasonable attorneys' fees.
I. FINDINGS OF FACTS.
The plaintiff, 716 Windsor Street Associated, LLC, is a limited liability corporation, which owns and manages the premises located at 416 Windsor Street Hartford, CT. The defendant, Catholic Charities/Catholic Family Services, Inc., is a nonprofit Connecticut corporation, which provides charitable services to clients in the local communities. The parties began discussions regarding a possible lease of the subject premises on or about December 1999. James O'Brien acted on behalf of the plaintiff with regard to the lease negotiations with the defendant. As of December 1999, the building at 416 Windsor Street, Hartford CT consisted of three floors, all of which had been unoccupied by tenants for at least two years despite Plaintiff's efforts to lease the property. Unauthorized individuals had entered the building during its vacancy. Broken windows may have provided access to persons into the building and individuals had been seen loitering in the rear of the building. During the lease CT Page 3494 negotiations, the defendant expressed concerns regarding the overall security of the building and needed repairs inside the building. On April 19, 2000, the Plaintiff signed a repair proposal with its contractor, Imagineers LLC (Imagineers), to start renovating the property. The proposal was contingent on the defendant Catholic Family Services signing a lease. (Defendant's Exhibit B). As part of the proposal, the Plaintiff opted to replace an old wood rear wall with a new wood wall rather than with a concrete block improvement. Id.
On April 28, 2000, the parties signed a thirty-six month lease for the subject premises. (Plaintiff's Exhibit 1). In accordance with the terms of the lease agreement, the lease was to begin on its Commencement Date, which was to be the earlier of "(i) thirty (30) days after notice by Landlord that the Landlord's Work has been completed and that the Premises are deemed ready for occupancy and are available to Tenant and Tenant's acceptance of such completion, or (ii) the date Tenant takes occupancy of the Premises." (Plaintiff's Exhibit 1). The anticipated Commencement Date was July 1, 2000. The lease outlined the monthly rent to be paid on the 1st of each month, which called for $3,394.00 for months 1-12, $3,676,83 for months 13-24, and $3,959.67 for months 25-36. Upon execution of the lease, the defendant paid first month's rent of $3,394.00 along with a security deposit of $3,400.00. The lease contained an integration clause. (Plaintiff's Exhibit 1, ¶ 25(1)).
Paragraph 7(d) of the lease set out the timetable for completion of the plaintiffs/Landlord's Work listed in Exhibit C to the lease. The lease provided that the Landlord's Work "shall be deemed completed . . . [by] the date which the Landlord's Work is substantially complete and ready for occupancy as certified by Landlord's architect or contractor, with the exception of Non-Delay items." (Plaintiff's Exhibit 1, ¶ 7(d)). Exhibit C to the lease lists nine items of Landlord's Work, only two of which were Non-Delay items which could be completed after the lease's Commencement Date. The seven "Delay Items" listed on Exhibit C to the lease included: 1. Removal of Storage Materials from the Premises; 2. Enclose wooden section of rear wall of the Premises with concrete or brick; 3. Enclose second floor rear windows with concrete block or brick; 4. Repair and replace all broken windows in the Premises; 5. Repair and paint all walls in the Premises; 6. Renovate bathrooms in the Premises; and 7. Wash all windows in the Premises.
Paragraph 7(d) provided the manner for the tenant to terminate the agreement if the Landlord's work was not completed:
 "Tenant may elect to cancel this lease at any time thereafter while Landlord's Work is not completed by CT Page 3495 giving written notice to Landlord of such cancellation, which notice shall be effective forty-five (45) days after Landlord's receipt of such notice, unless within such forty-five (45) day period Landlord completes the Landlord's Work, in which event such notice of cancellation shall be null and void and of no further force or effect.
(Plaintiff's Exhibit 1, ¶ 7(d)).
After the lease was executed on April 28, 2000, the Plaintiff's contractor, Imagineers LLC, began to address the repair work listed on Exhibit C. Instead of enclosing the wooden section of the rear wall of the Premises with concrete block or brick as provided in the lease, the Plaintiff followed the advice of its contractor and had a new wooden wall installed. The installation of the wooden wall saved the plaintiff $4,950.00 by avoiding the higher costs of constructing a block wall. Similarly, the second floor rear windows were enclosed with a wood and wire mesh alternative rather than the concrete block or brick as listed on Exhibit C. The Defendant made periodic inspections at the premises while the Plaintiff's agents were performing the work. In July 2000, the Defendant informed the Plaintiff that it had a number of regulatory and safety concerns, such as compliance with handicapped accessibility standards, and environmental concerns regarding fire code compliance and the possible presence of hazardous and toxic materials within the building. (Defendant's Exhibits R, S). While the improvements and repairs were being made by the plaintiff, the City of Hartford determined that the building underwent a "Change of use" and required the plaintiff to provide greater handicap accessibility at the building in question. The Plaintiff eventually installed a handicapped bathroom and ramp at a cost of $16,240.84, new carpeting for $11,525.00, and conducted environmental inspections and work totaling $4,918.43.
On August 22, 2000, the Defendant sent the Plaintiff's a letter purporting to "terminate and cancel the lease agreement dated April 28, 2000." (Plaintiff's Exhibit 6). This letter was received by the Plaintiff on August 24, 2000. While the Plaintiff contends that the letter did not effectively invoke the 45-day cure period under Paragraph 7(d) of the lease, the parties stipulated that, if applicable, the 45-day cure period would have expired on October 8, 2000. Plaintiff asserts that its contractor, Imagineers certified the required repair work, as substantially complete on August 24, 2000. (Plaintiff's Exhibit 7). On August 28, 2000, the Defendant responded with a letter stating Delay items 1, 2, 3, 4, and 7 as well as Non-Delay items 8, 9 on lease Exhibit C "Landlord's Work" had not been completed. (Defendant's Exhibit O). CT Page 3496 After the handicapped ramp and bathroom were installed, the City of Hartford issued a Certificate of Occupancy for the subject premises on September 19, 2000. (Plaintiff's Exhibit 10). By October 8, 2000, the Plaintiff had the removed storage items from the premises, repaired broken windows, and washed all the windows in the premises. (Defendant's Exhibit U). The plaintiff did repair and paint the walls of the premises. (Testimony of James O'Brien, Defendant's Exhibit K).
The Defendant's never took possession of the subject premises. The plaintiff did not re-let the premises until July 2002.
Plaintiff contends that the Defendant was bound by the terms of the 36-month lease effective 30 days from the certification of the repair work by its contractor, which was effectively October 1, 2000. In the Second Count of the complaint, the Plaintiff further claims that the Defendant is responsible for the costs of the accessibility renovations, carpet installations, and the environmental expenses under the Lease requirements by virtue of the doctrine of promissory estoppel. In response, the Defendant claims that the repair work was never "sufficiently completed" and therefore the lease agreement was null and void. Further, the Defendant contents that the Plaintiff would have had to comply with access regulations with or without its tenancy and that the plaintiff would not have been able to have any tenant to move into the subject premises unless all of the needed renovations were completed. By agreement of the parties, the record closed on this case on November 27, 2002, after admission of Defendant's Exhibit Y as a full exhibit on the record. For the reasons that follow, the Court finds that the repair work was not "sufficiently completed" as required by Paragraph 7(d) and Exhibit C of the lease, absolving the defendant of its obligations under the lease.
II DISCUSSION.
The principal issue in this case concerns whether or not the plaintiffs/Landlord's Work required under Paragraph 7(d) and Exhibit C to the Lease was completed which would have triggered the Commencement Date under the lease. For this analysis, the Lease document itself is of utmost importance. "In construing a written lease, which constitutes a written contract, "three elementary principles must be kept constantly in mind: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such manner as to give effect to every provision, if reasonable CT Page 3497 possible." Peter-Michael, Inc. v. Sea Shell Assoc. et al., 244 Conn. 269,275 (1998).
The Lease itself in Paragraph 7(d), indicates that the Landlord Work "shall be deemed completed . . . [by] the date which the Landlords Work is substantially complete and ready for occupancy as certified by Landlord's architect or contractor, with the exception of Non-Delay items." (Plaintiff's Exhibit 1, ¶ 7(d)). For this analysis, only "Delay Items" will be considered their completion alone would trigger the Commencement Date to occur. The Scheduled Commencement Date of July 1, 2000, passed without the completion of the Landlord's Work. Consequently, the Defendant was permitted to invoke the cancellation clause under the Lease. Pursuant to the clause, the Tenant must provide written notice of the cancellation to Landlord, which then gives the Landlord forty-five (45) days after its receipt of the notice to complete the Landlord's Work. If the Landlord completes the required work within the requisite time period the Tenant's cancellation notice is null and void. Here, the Defendant gave the Plaintiff notice of its intent to terminate the Lease via a letter dated August 22, 2000, which was received by the Plaintiff on August 24, 2000. (Plaintiff's Exhibit 6). While, the termination letter failed to mention the 45-day cure period present in the Lease, the Lease fails to require that the cancellation letter mention the cure period. The Court holds that the cancellation letter was effective and that the Plaintiff had until October 8, 2000, (45 days from August 24, 2000) to substantially complete the Landlord's Work as required the Lease. The Plaintiff's contractor certified the repair work as "substantially complete" on August 24, 2000. On August 28, 2000, the Defendant responded with a letter that Delay items 1, 2, 3, 4, and 7 on Exhibit C were not completed. The operative date for substantial compliance by the Plaintiff was October 8, 2000.
The Delay items on Exhibit C "Landlord's Work" operate as conditions precedent to the enforcement of the lease. "A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence." K.A. Thompson Electric Co., Ins. v. Wesco, Inc.,27 Conn. App. 120, 124 (1992). In K.A. Thompson, the court found that a purchase order of pumps and a pumping control system for a water pollution abatement project was not enforceable because a condition precedent requiring the equipment approval by the project managers was not fulfilled. 27 Conn. App. at 123-124. "Contingency clauses imply a promise that they will be pursued with a reasonable effort." Feinberg v.CT Page 3498Berglewicz, 32 Conn. App. 857, 861. In order for substantial compliance to be found, "[t]he analysis necessarily involves an inquiry into the totality of the facts and circumstances surrounding the performance of the contract." Pisani Construction, Inc. v. Krueger, 68 Conn. App. 361,365 (2002).
By October 8, 2000, the Plaintiff performed the following work concerning the Non-Delay items on Exhibit C to the lease. Removal of storage materials from the premises was completed. The rear wall of the premises was enclosed with a new wooden wall rather than a brick or concrete block wall. The second floor windows were enclosed with a wood and wire mesh alternative rather than concrete block or brick. The handicapped ramp was installed and the bathrooms were renovated to make them handicap accessible. The Plaintiff did repair and replace the broken windows on the premises as required by Exhibit C, but the repairs had to be done on a continual basis due to vandalism. In addition, the Plaintiff did wash all windows at least once as required by item 7 on Exhibit C, but that new dirt would accumulate on them. The plaintiff did repair interior wall damage and paint walls as required by item 6 on Exhibit C. Not all painting work was completed by October 8, 2000, as evidenced by Defendant's Exhibit K (Imagineers' painting invoice for the handicapped bathroom is dated 10/28/00). However, most of the wall repairs and painting were completed. Consequently, the Court finds that the plaintiff substantially complied with that portion of Exhibit C to the lease.
Due to the nature of the observed problems of unauthorized access though the rear of the building, as well as drug use and loitering in the area, Catholic Charities insisted that the Plaintiff build the stronger brick or concrete wall. Evidence was presented to show water leakage occurred, light passed through the wall, and that it was susceptible to damage by a crow bar. The fact that the Plaintiff had to repair windows on a regular basis further demonstrated the need for added security around the premises. The construction of a brick or concrete wall was possible, just more expensive than the wooden wall. The Plaintiff had a duty to build the sturdier wall in the rear of the building. Similarly, the Plaintiff had a duty to fill in the second floor rear windows with brick or concrete block.
The Defendant has alleged that the Plaintiff's actions with regard to the rear wall constituted bad faith and that they should not profit from their wrong. "Good faith is a subjective standard involving a determination of the intent or state of mind of the party concerned, taking into account the actual knowledge of the person as well as that person's motives." K.A. Thompson, 27 Conn. App. at 127. Bad faith involves "actual or constructive fraud, or a design to mislead or deceive CT Page 3499 another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive." Habetz v. Condon,224 Conn. 231, 237 (1992). "Bad faith means more than negligence; it involves a dishonest purpose" Id "[T]he general principle embodied in the bad faith exception [is] that an individual should not profit from his own deceptive and unscrupulous conduct." Id., at 239-240.
The Plaintiff in fact authorized the construction of the wood wall by Imagineers on April 19, 2000, nine days prior to the signing of the lease. (Defendant's Exhibit B). The Plaintiff realized cost savings of $4,500.00 by constructing a wooden wall instead of one composed of brick or concrete. Id. Even though Plaintiff's acceptance of Imagineers construction proposal was conditioned on the Defendant signing the lease, the Plaintiff did not disclose to the Defendant that it had already arranged to have the new wall be made of wood. The lease was signed on April 28, 2000, with the express condition that the wall be constructed with brick or concrete materials. Due to the fact that the Plaintiff failed to contract Imagineers to change the construction order to provide for a brick or concrete wall, it is apparent that the Plaintiff had no intention to complete the repairs as the lease required, and consequently acted in bad faith. Judgment is entered for the Defendant as to Count I of Plaintiff's Complaint.
In Count II of its complaint the Plaintiff alleges that the Defendant is responsible for the costs of the accessibility renovations, carpet installations, and the environmental expenses under the doctrine of promissory estoppel. "Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . . It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge. (Citations omitted; internal quotation marks omitted.)" Chotkowski v. State, 240 Conn. 246, 268 (1997).
In this case, the parties had already entered into a written agreement. The Plaintiff was required to renovate the bathrooms pursuant to Exhibit C to the Lease. The City of Hartford Code mandated that any required renovations to comply with the Americans with Disabilities Act (ADA). The City would not have issued a Certificate of Occupancy without installation of the handicap ramp. The costs of the bathroom and ramp CT Page 3500 were essentially born by the Plaintiff pursuant to the lease. There was no promise by the Defendant that it would reimburse the Plaintiff their costs, just statements that the repairs were necessary for the Defendants to take occupancy of the premises. The Plaintiff knowingly arranged for the installation of the ramp and bathroom to comply with the ADA and ensure occupancy of the building, not because of some detrimental reliance on an additional promise by the Defendant outside of the lease. The Plaintiff would have had to comply with access regulations for any tenant move into the subject premises. Similarly, The Plaintiff agreed to install new carpet and pay for the environmental inspections, without any new promise from the defendant. If the Plaintiff complied with Exhibit C of the lease, the Defendant's promised to occupy the premises and pay rent for 36-month under the same lease.
Judgment is entered for the Defendant as to Count II of Plaintiff's complaint.
Due to the fact that the repair work was not "sufficiently completed" by the Plaintiff, the lease was rendered null and void and the Defendant's obligations absolved. As a result the Defendant is entitled to return of the first month's rental payment of $3,394.00 and the security deposit amount of $3,400.00 for a total of $6,794.00 plus costs, and reasonable attorney's fees pursuant to Paragraph 18(v) of the lease. Judgment for Defendant Catholic Charities (Plaintiff on the Counterclaim) The Judgment amount of $6,794.00 shall be paid to Defendant Catholic Charities' counsel by April 4, 2003. The court shall hold a hearing regarding the attorney's fees.
BY THE COURT
 ___________________ Angelo L. dos Santos, Judge
CT Page 3501